Law Office of
**HERNANDEZ | HAMILTON | LAMOUREUX**
The Johnson House Offices
455 West Paseo Redondo
Tucson, Arizona 85701-8254
JOSHUA F. HAMILTON (AZ028084)
Email: josh@hhlaz.com
Telephone: (520) 882-8823
Fax: (520) 882-8414
Attorney for Defendant Gutfahr

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br>　　　　　Plaintiff,<br><br>　　　vs.<br><br>Elizabeth Gutfahr,<br>　　　　　Defendant. | No. 24-cr-08132-RM-1<br><br>**DEFENDANT'S OBJECTIONS TO DRAFT PRESENTENCE INVESTIGATION REPORT** |

The defendant, through her attorney, hereby objects to the following factual statements, conclusions, and recommendations contained in the draft presentence investigation report (hereinafter, the "PSR") prepared in this case. Fed. R. Crim. P. 32(f). The bases for the objections are set forth below in the accompanying memorandum of points and authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.　　INTRODUCTION

This case is ultimately about taxpayer dollars stolen from the public till and the consequences that result when an elected official siphons off money which would have otherwise been legitimately available for use by local government officials. Elizabeth Gutfahr has acknowledged that, while duly elected as the Santa Cruz County Treasurer,

1

she stole approximately $38.7 million from the County's savings account at Chase Bank over the course of about a decade. The loss incurred is undoubtedly significant. As a result of the theft, the taxpayers lost the benefit of those funds, which has understandably led to feelings of extreme anger towards Ms. Gutfahr and other County officials, most notably, the Santa Cruz County Board of Supervisors, which for unknown reasons, never noticed any of the thefts occurring over the span of a decade. The Board of Supervisors has also endured political backlash and embarrassment.

  Ms. Gutfahr's actions affected others without question. But whether they resulted in "substantial financial harm" to the Board of Supervisors as contemplated by the guidelines is a question left unanswered. For example, the PSR admits that every single County entity "received their allocated allotments during the course of the instant offense." (PSR ¶ 60.) Upon information and belief, the funds stolen were not monies allocated for expenditure in the annual budget by County entities but, rather, appear to have been taken from surpluses. While that money was not Ms. Gutfahr's to take and could have undoubtedly been better "used for salaries, repairs/improvements, technology, raises, and necessities," *id.*, she did not touch the corpus of tax dollars but, rather, only the gains earned from investments. It is also unclear whether the Board of Supervisors, as a government entity, qualifies as a "victim" for restitution purposes and under the relevant Guidelines provisions for determining whether a financial loss was "substantial."

  Considering these unanswered questions, the plea agreement specifically leaves to the Court the determination as to whether the offense conduct resulted in "substantial financial hardship" under USSG §2B1.1(b)(2)(A)(iii). (Doc. 11.) The issue becomes

2

significant in the sentencing context in this case because Ms. Gutfahr otherwise qualifies as a Zero-Point Offender. USSG §4C1.1. However, to be eligible for treatment as a Zero-Point Offender, she cannot "personally [have] cause[d] substantial financial hardship" to any victims. USSG §4C1.1(a)(6).

## II.   SPECIFIC OBJECTIONS TO THE PSR

The PSR calculates an applicable guidelines range of 151-188 months. This reflects a base offense level of 6, plus a 22-level upward adjustment for the loss amount, a 2-level upward adjustment for substantial financial hardship to the County, and a 2-level upward adjustment for sophisticated means in the fraud scheme. (PSR ¶ 32.) The PSR further assesses an additional 2-levels for abuse of a position of public trust and a 2-level enhancement for failing to report a source of income above $10,000 from criminal activity. (*Id.* ¶¶ 76, 80.) Regarding substantial financial hardship, the PSR concludes that "[a] government entity such as Santa Cruz County appears to qualify as a victim for purposes of the enhancement." (*Id.*, ¶ 71.)

### A. Financial Hardship Enhancement (USSG § 2B1.1(b)(2)(A)(iii))

Ms. Gutfahr objects to the PSR's imposition of a 2-point financial hardship enhancement under USSG §2B1.1(b)(2)(A)(iii). (PSR ¶ 71.) Pointing to intangibles like the potential for "bond interests rates" being higher "due to erosion of trust in the county's credit worthiness," and that "the bulk of the funding was ear-marked for public schools and fire districts that already struggle with limited budgets," the PSR concludes that the County "*will* face substantial financial hardship as a result of the instant offenses" under USSG §2B1.1(b)(2)(A)(iii) (emphasis added). (PSR ¶ 72.) These conclusions,

however, are far too speculative and lack sufficient factual and legal support for the imposition of the guideline enhancement.

Stated differently, the government has failed to establish that the 2-level enhancement under USSG §2B1.1(b)(2)(A)(iii) should apply. It only applies when the government shows by clear and convincing evidence that the defendant's conduct "resulted in" the substantial financial hardship of one or more individuals or entities.[1] This begs an important question: Did Ms. Gutfahr's theft cause substantial financial harm as defined in the Ninth Circuit? The answer to this question is no.

Courts have interpreted conduct that "resulted in" substantial financial hardship to impose a causation requirement that embraces two distinct concepts: (1) but-for causation; and (2) proximate causation. *United States v. George*, 949 F.3d 1181, 1187 (9th Cir. 2020). But-for causation means that, without the conduct, the harm would not have occurred. *Id.* Proximate causation, on the other hand, exists when the harm was a foreseeable result of the wrongful act. *Id.* When considering whether conduct has "resulted in" a substantial financial hardship, the commentary to the guidelines reflects the Commission's analysis of the factors, albeit non-exhaustive, that it considers a substantial financial hardship. *See* U.S.S.G. §2B1.1(b)(2)(A)(iii) cmt. n.4(F).

---

[1] Because the imposition of the 2-level upward enhancement under §2B1.1(b)(2)(A)(iii) would also preclude a 2-level downward adjustment for Zero-Point Offenders under §4C1.1(a)(6), it has an "extremely disproportionate impact on the sentence." The government must therefore prove its applicability by clear and convincing evidence rather than a mere preponderance. *See United States v. Valle*, 940 F.3d 473, 479 (9th Cir. 2019), *quoting United States v. Jordan*, 256 F.3d 922, 930 (9th Cir. 2001); *see also United States v. Staten*, 466 F.3d 708 (9th Cir. 2006) (applying clear and convincing evidence standard where application produces disproportionate impact on sentence compared to offense of conviction).

4

The Commission has characterized substantial financial hardship as a loss that significantly impacts the victim's resources, such as one that causes an individual or entity to: (i) become insolvent; (ii) file for bankruptcy; (iii) suffer "substantial loss of a retirement, education, or other savings or investment funds"; (iv) make "substantial changes to his or her employment, such as postponing his or her retirement plans"; (v) make "substantial changes to his or her living arrangements, such as relocating to a less expensive home"; or (vi) suffer "substantial harm to his or her ability to obtain credit." *Id.*; *see also United States v. Aderinoye*, 33 F.4th 751, 757 (5th Cir. 2022) (substantial financial hardship is "a loss" that "significantly impacts the victim's resources"); *United States v. Chukwu*, 842 F. App'x 314, 322 (11th Cir. 2021); *United States v. Minhas*, 850 F.3d 873, 879 (7th Cir. 2017) (changes to employment or retirement plans are substantial hardships because they are significant alterations to one's life circumstances). When evaluating the government's evidence of a "substantial financial hardship," district courts consider whether the individual or entity suffered a loss that was substantial considering their individual financial circumstances overall. *See United States v. Myers*, No. 18-cr-39 (CRC), 2022 WL 103177 at *6 n.5 (D.D.C. Jan. 11, 2022), *citing George*, 949 F.3d at 1184 (because substantiality is a relative concept, to satisfy section 2B1.1(b)(2), "financial hardship must be substantial in comparison to something else"—most naturally, "the financial condition of the victim").

In this case, the government has not shown by a preponderance of the evidence or by clear and convincing evidence that Ms. Gutfahr caused substantial financial hardship to the County. As an initial matter, the government has failed to establish that any of Ms.

5

Gutfahr's actions caused the County to endure the types of substantial financial hardship identified by the Commission in the commentary. The government has not established, for example, that Ms. Gutfahr's actions caused the County to become insolvent, to file for bankruptcy, to move into smaller offices, to have to lay off employees, etc.

Nor has the government established that Ms. Gutfahr's actions caused the County to suffer a substantial loss of retirement, education, or other funds. Although several County subdivisions have expressed general concern that they may have future difficulties in terms of "jeopardizing bond ratings" or "interest rates, making it difficult to sell bonds," and that the resulting "culture of finger pointing" may "jeopardize[e] voter confidence in approving bonds or budget overrides" or "obtaining grants or community partners," *see* PSR ¶¶ 61-64, these concerns are highly speculative and may never occur. Furthermore, even assuming the County could establish that such difficulties are likely to or will occur in the future, it has failed to establish that such losses would have been foreseeable or proximately caused by Ms. Gutfahr's actions.[2] Nor has the government

---

[2] It bears mentioning that there is a *lot* of distrust among the Santa Cruz County voters towards their local government officials, but that distrust does not start and stop with Ms. Gutfahr. Rather, numerous elected county officials have justifiably faced scrutiny for other financial scandals unrelated to Ms. Gutfahr's crimes. The office of the Santa Cruz County Treasurer has been mired in scandal for many, many years, long before Ms. Gutfahr's crimes were discovered. For example, the prior Santa Cruz County Treasurer, whom Ms. Gutfahr replaced, caused lost "public trust in the Treasurer's Office" and was suspended without pay by the Board of Supervisors in June 2012 for reportedly "failing to adequately reconcile differences between his books and those of the County Finance Department." Curt Prendergast, *Gutfahr Says She Never Thought She'd Win County Treasurer's Race*, Nogales Int'l (Aug. 31, 2012), https://www.nogalesinternational.com/news/gutfahr-says-she-never-thought-she-d-win-county-treasurer-s-race/article_1bee6048-f385-11e1-a2c3-0019bb2963f4.html.

established that Ms. Gutfahr's actions caused the County to make substantial changes to its functioning of day-to-day operations. In fact, the opposite is true. For the past ten or so years, the County appears to have fully functioned without interruption whatsoever despite Ms. Gutfahr's crimes. Upon information and belief, not a single budget appropriation ever went unpaid.

Nor has the government shown that Ms. Gutfahr's actions harmed the County's ability to obtain credit. There is much speculation about whether bond ratings might be negatively impacted in the future. But nothing has occurred to date. And those bond ratings may have been negatively impacted with or without Ms. Gutfahr's crimes. *See supra.* Considering the armada of litigation between Santa Cruz County, the Arizona Auditor General, the Arizona Attorney General, the various banks, and other parties to the myriad civil cases stemming from the instant case, it remains unclear if the funds misappropriated by Ms. Gutfahr will be recouped in whole or in part via civil remedies, insurance payouts, etc.[3] Because the outcome of the civil litigation remains unknown, the County has not suffered—and may never suffer—an "actual loss" of any kind. *See*

---

[3] In November 2024, Santa Cruz County filed a lawsuit against the State of Arizona and the Arizona Auditor General claiming she was grossly negligent in failing to notice Ms. Gutfahr's actions during mandatory audits. The lawsuit asserts the Auditor General's practices were "substandard" and that Ms. Gutfahr's "scheme would have been detected many years ago had the Auditor General properly conducted it audits," claiming that a simple review of "almost any Savings Account bank statement" would show transfers which "would have stood out like a sore thumb." In April 2025, the Auditor General filed a countersuit against Santa Cruz County, accusing its Board of Supervisors of negligence for failing to review reports and properly supervise Ms. Gutfahr in her capacity as Treasurer, alleging the Board members failed to review mandatory financial reports including cash conciliation reports and ignoring monthly treasurer reports altogether.

USSG §2B1.1 cmt. n. 1 (defining victim as any person "who sustained any part of the *actual* loss").  For instance, if the County is successful in its lawsuit against the Auditor General, it could be awarded damages in an amount greater than the actual amount stolen.  Because the outcome of the civil litigation is uncertain, it is too speculative for the government to assert that the County has suffered—or will suffer—the types of speculative damage to bond ratings or voter confidence as referenced in the PSR.

None of this is to say that the County (or, more importantly, its taxpayers) did not suffer financial hardship because of the crimes Ms. Gutfahr committed.  The issue is that the government has not met its burden to establish that the offenses of conviction resulted in the but-for or proximate cause of a "substantial financial hardship" as contemplated by the guideline.  Had Ms. Gutfahr not stolen $38.7 million from the County, that money could have been spent on any number of legitimate government functions or purposes.  But given the annual budget was substantially more than that, and the misappropriation went completely undetected for nearly a decade, and the County budget was paid out in full each year, the government has thus not shown that Ms. Gutfahr's scheme caused substantial financial hardship as contemplated by §2B1.1(b)(2)(A)(iii).  *Cf. United States v. Day*, 117 F.4th 622 (5th Cir. 2024) ("[W]hether a loss has resulted in a substantial hardship . . . in most cases, [is] gauged relative to each victim.  The same dollar harm to one victim may result in a substantial financial hardship, while for another it may be only a minor hiccup."), *quoting United States v. Minhas*, 850 F.3d 873, 878 (7th Cir. 2017).  The County's annual budget is "typically just over $1 billion" per year.  (PSR ¶ 72.)  While the "loss of over $37 million is substantial," *id.*, that constitutes approximately

8

0.37% of the County's total budget year-after-year spread out across nearly a decade and does constitute "substantial financial harm" to the County within the meaning of the guideline.

### B. Failure to Report Source of Income Enhancement (USSG §2T1.1(b)(1)) and Separate Offense Groups (USSG §3D1.2)

Ms. Gutfahr objects to the PSR's imposition of a 2-point failure to report source of income exceeding $10,000 in any year enhancement under USSG §2T1.1(b)(1) and to the separate grouping of the embezzlement/money laundering offenses and the tax evasion offense. (PSR ¶¶ 70, 80.) She pled guilty to embezzling $38.7 million as a public official, which she then laundered by wiring it into a shell company bank account and failed to report to the IRS and pay taxes on that income as required by law. The PSR groups these offenses separately into two groups. First, it calculates an adjusted offense level for Ms. Gutfahr's embezzlement and money laundering convictions of 36. (*Id.* ¶ 85.) Second, it assigns an adjusted offense level of 28 for tax evasion. (*Id.*) The base offense level for tax evasion (26) is then increased to 28 because the offense involved more than $10,000 a year in unreported income from criminal activity, *i.e.*, the embezzlement and money laundering offenses. *See* USSG §2T1.1(b)(1).

Next, the PSR calculates Ms. Gutfahr's combined offense level based upon the adjusted offense levels of 36 for embezzlement/money laundering and 28 for tax evasion. Starting with the higher of the two offense levels (36), it applies the USSG §3D1.4(a)-(b) formula to reflect the additional harm caused by Ms. Gutfahr's tax crime. (PSR ¶ 85.) Because the offense level for tax evasion (28) was between 5-8 levels less than the

9

offense level for embezzlement/money laundering (36), the PSR thus increases Ms. Gutfahr's offense level from 36 to 37. (*Id.* ¶¶ 70, 86-87.) This was an error.

Tax evasion should be grouped with embezzlement/money laundering. The guidelines specifically prohibit separate groupings of these offenses. *See* USSG §3D1.2(d) (grouping offenses under sections 2B1.1 (embezzlement), 2S1.1 (money laundering), and 2T1.1 (tax evasion) together for guideline purposes). Under USSG §3D1.2(d), the table lists offenses under sections 2B1.1 (embezzlement), 2S1.1 (money laundering), and 2T1.1 (tax evasion), as offenses that "shall" be grouped together into a single group. Ms. Gutfahr's tax evasion count should therefore be grouped together with the other counts and not given a separate grouping and her Total Offense Level should be adjusted downwards accordingly.

Once grouped together, Ms. Gutfahr's offense level would not be increased from 36 to 37 before adjustment for acceptance of responsibility. "Convictions on multiple counts do not result in a sentence enhancement unless they represent additional conduct *that is not otherwise accounted for by the guidelines.*" *United States v. Haltom*, 113 F.3d 43, 45-46 (5th Cir. 1997) (emphasis in original), *citing* USSG §3D1.2 cmt. The conduct for Ms. Gutfahr's embezzlement/money laundering cannot result in an enhanced offense level for tax evasion because the counts should not have been separated from one another in the first place. *Id.* at 46.

Ms. Gutfahr's offense level for tax evasion is also increased by 2 in the PSR because her unreported income was derived from criminal activity, *i.e.*, the embezzlement and money laundering. (PSR ¶ 80.) It is therefore indisputable that the

embezzlement/money laundering "embodies conduct that is treated as a specific offense characteristic" of the tax evasion count. *Haltom*, 113 F.3d at 46-47. ("The conduct underlying Haltom's mail fraud conviction was counted twice toward his sentence, once as the basis for his mail fraud offense level and again a specific offense characteristic of the tax evasion counts. This double-counting actually lengthened Haltom's sentence: the enhanced tax evasion count was directly responsible for the ultimate 2-level increase in his total offense level for mail fraud, from 20 to 22. The purpose of section 3D1.2(c) is to prevent precisely this sort of "'double counting' of offense behavior."); *see also* USSG §3D1.2(c) ("Counts involve substantially the same harm within the meaning of this rule . . . [w]hen one of the counts embodies conduct that is treated as a specific offense characteristic in . . . the guideline applicable to another of the counts.").

### C. Information Derived from Arizona Auditor General's Report

The PSR contains several factual assertions which appear to be generated from an August 2024 report prepared by the Arizona Auditor General. The 15-page report was prepared in anticipation of litigation and was generated for review by the Arizona Legislature, the Arizona Attorney General, and the Arizona Governor. The report largely places the blame upon the Board of Supervisors for a lack of oversight: "The primary responsibility for the prevention and detection of fraud rests with those charged with governance of the entity and management." (Ariz. Auditor Gen. Rpt., 8/26/24, at 12.) It proclaims that "no one at the County Treasurer's Office truthfully reconciled the Treasurer's Reports to bank statements [and thus] no one discovered that the Treasurer's wire transfers were not recorded in the County Treasurer's accounting system or that

11

entities actually had less money that what [Ms. Gutfahr] reported," and accuses the Board of Supervisors of failing to monitor the monthly cash conciliation reports as required by statute: "Had anyone from the County reviewed these monthly Cash Reconciliation Reports, they may have noticed irregularities and discovered the Treasurer's actions." (*Id.* at 8-9.)  Part of that report—which, for what it is worth, was strongly refuted by the Board of Supervisors as a thinly-veiled effort to "minimize responsibility" for lack of oversight by the Auditor General—was generated by summarizing information provided by three employees of the Santa Cruz County Treasurer's Office which, in turn, was the formed factual basis for several allegations contained in the PSR.  (*See*, *e.g.*, PSR ¶¶ 23-32.)  That information is not sufficiently reliable to be utilized for sentencing purposes and should be removed from the final PSR.

### D. Paragraph 48

The PSR contains a paragraph summarizing portions of an April 2024 FBI interview of Ms. Gutfahr, which includes an inaccurate statement regarding a gift made by Ms. Gutfahr to another individual.  That statement, which is unsourced, cannot be traced to any information contained within the disclosure provided by the government to date.  As a result, it is not sufficiently reliable to be utilized for sentencing purposes and should be removed from the final PSR.

### III. CONCLUSION

Based upon the foregoing, Ms. Gutfahr's objections to the PSR should be sustained and the guidelines calculations amended to remove the 2-level enhancement under §2B1.1(b)(2)(A)(iii).  Ms. Gutfahr should be regarded as a Zero Point Offender

under §4C1.1(a) and she should be assessed a 2-level reduction as a result. The embezzlement/money laundering offenses should be grouped with the tax evasion offense and therefore should not be subject to a 1-level increase under §3D1.4. With acceptance of responsibility, the proper Total Offense Level should be 30, which would establish a guideline range of 97-121 months.

RESPECTFULLY SUBMITTED this 28th day of May, 2025.

Law Office of
**HERNANDEZ | HAMILTON | LAMOUREUX**

*s/Joshua F. Hamilton*
JOSHUA F. HAMILTON
Attorney for Defendant Gutfahr

## CERTIFICATE OF SERVICE

I, Linda Yrrizarry, do hereby certify that on this 28th day of May, 2025, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing, and transmittal of a Notice of Electronic Filing was sent to the following recipients:

Hon. Rosemary Marquez
United States District Judge

Nicholas W. Cannon, Trial Attorney
United States Department of Justice

Jane L. Westby, Assistant
United States Attorney's Office

Willow Stokes, Senior Officer
United States Probation Department

Joshua F. Hamilton
Attorney for Defendant Gutfahr

By *s/Linda Yrrizarry*
    LINDA YRRIZARRY