Law Office of
**HERNANDEZ | HAMILTON | LAMOUREUX**
The Johnson House Offices
455 West Paseo Redondo
Tucson, Arizona 85701-8254
JOSHUA F. HAMILTON (AZ028084)
Email: josh@hhlaz.com
Telephone: (520) 882-8823
Fax: (520) 882-8414
Attorney for Defendant Gutfahr

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br>                    Plaintiff,<br><br>        vs.<br><br>Elizabeth Gutfahr,<br>                    Defendant. | No. 4:24-cr-08132-RM-1<br><br>**DEFENDANT'S SENTENCING MEMORANDUM** |

The defendant, through her attorney, hereby respectfully recommends a sentence of **63-78 months followed by three-years of supervised release** in this matter. This sentencing recommendation is supported by the accompanying memorandum[1] of points and authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Elizabeth Gutfahr is not the typical defendant, and this is hardly the typical case. At all times relevant, she was elected to serve as the Santa Cruz County Treasurer. Her public office, and the public attention it draws, distinguishes her and her crimes. Her convictions arise from the abuse of her position of trust in the community, and the corrupt

---

[1]Certain redactions have been made to this filing. An unredacted copy will be filed with the Court under seal and distributed to the parties.

actions she undertook as Treasurer, a position she resigned from after her crimes came to light in April 2024.

At sentencing, the government will undoubtedly focus upon Ms. Gutfahr's illicit actions and argue that the underlying facts reflect an egregious betrayal of her oath as a public servant. The government is correct in that regard. But Ms. Gutfahr is also an atypical defendant in many ways, including in ways that extend far beyond the confines of this case. She has lived an otherwise extraordinarily honorable life and is distinguished by deep devotion to her personal and religious ideals, despite having faced many great personal life challenges—including ███████████████████████ ████████████████████████████████████████ ██████████████████████████   ████████████████ ████████████████████████████████████ *See infra.* An unnecessarily lengthy prison sentence is unwarranted.

Lawyers' rhetoric cannot capture the depth and breadth of Ms. Gutfahr's lifelong commitment to helping those in need and the betrayal of those fundamentals by her shocking theft of taxpayer dollars for her own personal use. How is it possible that a devout Catholic woman could deviate from the righteous path so extremely and for so long? The Court has received and reviewed several character letters which speak to this puzzling dichotomy.

The goal of this memorandum is not to repeat that Ms. Gutfahr is a good person who did a bad thing. Nor is it to bury the government's legitimate arguments about the mindboggling scope and magnitude of the underlying offense conduct and the ripple

effects it has had and will have on an economically forlorn border community for many years to come.  Those things are all true.  This memorandum instead focuses upon Ms. Gutfahr's personal background and life story and the circumstances surrounding her misbehavior, topics which are now properly before the Court for consideration pursuant to 18 U.S.C. § 3553(a).

Unsurprisingly, Ms. Gutfahr's convictions have rendered her a media punchline and stripped her of most personal, professional, and financial benefits.  She resigned from her position as Treasurer in disgrace.  The negative news coverage has been unrelenting.  She is left living as a pariah, cooped up in a friend's house waiting for her sentencing date to arrive.  She has turned over essentially everything of value in her and her family's collective possession to the court-appointed receiver to begin repaying some of her misappropriated funds.[2]  It is anticipated that between $10.73 million and $13.53 million (or more) of stolen funds will be recovered through that process, which remains ongoing.

Also illustrative of the countless minor indignities she now faces because of her crimes: her once broad circle of friends and allies has largely disappeared.  While all defendants suffer inevitable personal and professional consequences when convicted of serious federal crimes, Ms. Gutfahr in many important respects has already been punished relatively more harshly due to her position as an elected politician.  The

---

[2]*See Santa Cruz County v. Elizabeth Gutfahr et al*., Pima County Superior Court Cause No. C20244535.  Under Arizona law, a court-appointed receiver acts effectively like a bankruptcy trustee who is assigned to neutrally protect and distribute assets.  Ms. Gutfahr agreed to not contest and to cooperate with the receivership and has voluntarily turned over all available items of value (including real estate, bank accounts, vehicles, jewelry, etc.) to be sold and the proceeds turned over to Santa Cruz County.

collateral consequences of her crimes have been and will be extreme; they will endure for the rest of her time left on this earth.

Ms. Gutfahr is now 63 years old, with her entire life in tatters.  She has suffered personal and professional ruin. ████████████████████  █████████████ ███████. Her family is in agony.  And she knows she now must leave them soon to begin serving a prison sentence.  Notwithstanding her criminal convictions and the public trust that she betrayed, Ms. Gutfahr is deserving of some leniency because of her remorse, her cooperation with the investigative process, ███████████████, and the lack of a compelling need to impose an unduly harsh custodial sentence.

In sentencing Ms. Gutfahr, the Court's task is a heavy one.  The starting point for the Court's analysis is of course to calculate the applicable, albeit advisory, federal Sentencing Guidelines range.  A rote application of the guidelines calculations produces a preposterous result (135-168 months) that would not fit the individual offender nor her offenses, as evidenced by the PSR's own sentencing recommendation of 120 months.  The mechanical guidelines calculations are driven in large part by an erroneous assessment that Ms. Gutfahr does not qualify as a Zero-Point Offender under USSG §4C1.1(a), which has been addressed separately in the defendant's objections to the draft PSR, filed on May 28, 2025, and which are incorporated by reference hereto.  (Doc. 25.) As of the date of this filing, the government has not filed any response to those objections.  Furthermore, the PSR's recommended guidelines calculations themselves are moored primarily by the dollar amount involved and a "substantial financial harm"

enhancement, which should not be assessed. (*Id.*) Those issues are more fully addressed in Ms. Gutfahr's objections and are also discussed in detail below.

But even a properly calculated guideline sentence—which results in a sentencing range of no greater than 87-108 months—would still be improper in this case after considering the various § 3553(a)'s sentencing factors. Respectfully, while the PSR itself recognizes that its calculated guidelines range far exceeds an appropriate punishment in this case, the recommended sentence of 120 months' imprisonment would still be too severe a punishment here, especially for someone of Ms. Gutfahr's ███████.

Ms. Gutfahr will spend the rest of her life trying to repay what she has stolen. Her political and professional careers are over. Her reputation is forever destroyed. The later years of her life are in shambles. She is certain to never commit future offenses. And her current state—living under a permanent shadow of disgrace and mockery—is sufficient to reflect the seriousness of the offenses and to promote respect for the law. This is especially so when a guideline sentence would effectively be akin to a natural life sentence without the possibility of parole (LWOP) and would permanently rip Ms. Gutfahr away from her husband, her son, her daughter-in-law, her grandchildren, and 87-year-old mother, whom are all she has left to live for at this point. Such a sentence would short-circuit any possibility of her using her remaining years to work towards earning forgiveness and repaying the people of Santa Cruz County.

For the reasons stated herein, it is respectfully urged that a below-guidelines sentence of 63-78 months is sufficient but not greater than necessary to satisfy the § 3553(a) factors and the interests of justice.

## II.    GENERAL SENTENCING FRAMEWORK

On November 21, 2024, Ms. Gutfahr pled guilty to an Information charging three interrelated crimes stemming from her embezzlement of $38.7 million from the Santa Cruz County Treasury.  (Doc. 1.)  Pursuant to the plea agreement, she admitted guilt to Embezzlement by a Public Official, a Class C felony, in violation of 18 U.S.C. § 666(1)(1)(A); Money Laundering, a Class C felony, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and Tax Evasion, a Class D felony, in violation of 26 U.S.C. § 7201. (Doc. 12.)

The PSR calculates a **Total Offense Level of 33** and **Criminal History Category I**.  (PSR ¶¶ 71-89.)  Based upon these calculations, it recommends a variant sentence totaling 120 months.

As of the date of this filing, the government has not submitted its sentencing memorandum.

Despite Gutfahr's inexcusable offense conduct, her otherwise exemplary character, background, and life history offer grounds for leniency, and justify a downward variance beyond what is recommended in the PSR.

As this Court knows, section 3553(a) requires it to fashion a sentence that is "sufficient, but not greater than necessary."  Ms. Gutfahr is not some caricature for mockery and vilification.  She is a real person.  The Court's difficult task is to look beyond surface-level views when it fashions its sentence and to consider the actual human being who committed these crimes and the complex circumstances surrounding the offense conduct, as well as the important principle that "no defendant should be made

a martyr to public passion." *United States v. Gupta*, 904 F.Supp.2d 349, 355 (S.D.N.Y. 2012). As discussed in more detail below, while Ms. Gutfahr deserves real punishment in this case, she is also worthy of leniency in several key respects.

## III.     BACKGROUND INFORMATION

### A. Ms. Gutfahr's Personal History and Character

#### 1. Early Life

Ms. Gutfahr (né Gardner) was born in Nogales, Arizona on ███████████. Growing up, she and her family lived right next to the football stadium. She had a humble and idyllic childhood, living in a small town. She would ride her bike everywhere. Her favorite spot to hang out was the public pool where she and her friends would spend lazy summer afternoons. Everyone in town knew her and she knew everyone. As a younger child, she was given lots of independence by her parents; the only real rules she had to worry about following were to be home before noon on the weekends and to be home for dinner before the streetlights turned on.

Ms. Gutfahr's father worked in the mining industry as a diamond driller for the Metler Brothers Drilling Company. Her mother was a homemaker and handled all the household finances. The family was not wealthy by any means, but they were able to meet their basic needs. She was loved, nurtured, and well-cared for. However, Ms. Gutfahr's father's job as a diamond driller meant that he was away for long stints, often working in mines throughout rural Arizona and New Mexico. Work was scarce, and he often had to travel far to where the work sites were located. In 2009, he passed away from lung cancer, likely caused by exposure to dust in the mining industry. Ms.

Gutfahr's mother, age 87, still lives in Rio Rico and is currently cared for by Ms. Gutfahr's sister.

## 2. Education and Employment History

Ms. Gutfahr graduated from Nogales High School in 1979. She worked as a babysitter up until her senior year to help out with family expenses. When she turned 17, she got a part-time job at a title company, Gulf American Corporation (GAC), which eventually was bought out by Florida-based Avatar Holdings, Inc. (Avatar). She was dedicated to her job, so much so that she missed out on many high school experiences, such as senior picnics, prom, etc., because she was too busy working.

Ms. Gutfahr worked at GAC/Avatar for more than 35 years (1979-2012). The company was good to her; she made a decent salary and eventually earned additional commissions from commercial real estate sales after she obtained her real estate license. She was permitted by Avatar and its subsidiary, Rio Rico Properties, Inc., to sell industrial and commercial property, which at the time, was something no other female employee was allowed to do at the company.

In addition to her strong work ethic, Ms. Gutfahr also has an admirable volunteer history. When her only child was still in middle school, she served on the local school board in Rio Rico and was a member of the sports teams' booster clubs. She enjoyed being an active member of the community. For example, she volunteered ███████

████████████████████████████████████████████████████████████

██████████████████████████████████████████ She was also a

board member at █████████████████████████████████████████

1 ██████████████████████████████████████████████████████,[3]

2 She also helped for many years at a non-profit organization called ████████████

3 ████████████████████████████████████████████████████████

4 ████████ During her time volunteering at ████████████████████

5 █████████████████████████████████

6 During her time at ██████████████████, Ms. Gutfahr became especially

7 close with ██████████████████████████████

8 █████████  ██████████████████████████████████████

9 ████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████

12 ███████████████████████████████████████████████████████

13 █████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████  █████

15 █████████████████████████████████████████████████████████

16 ██████████████████████████████████████████████████████

17 █  ██████████████████████████████████████████████████████

18 █████████████████████████████████████████████████████████

19 ████████████████████████  ███████████████████████████████

20 █████████████████████████████████████████████████████████

21 ████████  ████████████████████████████████████████████████

22 _____

[3]Letters from. ██████████████████████.
[4]Letter from ███████████████
[5]Letters from ████████████████████.

1 ████████████████████████████████████████████████

2 ███████████████████████████

3

4 █████████████████████████████████████████████ ███

5 █████████████████████████████████████████████████

6 ████████████████████████████ ████████████████████

7 █████████████████████████████████████████████████

8 ███████████████████ ██████████████████████████████

9 █████████████████████████████████████████████████

10 █████████████████████████████████████████████████

11 █████████████████████████████████████████████████

12 █████████████████████████████████████████████████

13 █████████████████████████████████████████████████

14

15 ███████████████████████████

16

17 ████████████████████████████████████████████████

18 █████████████████████████████████████████████████

19 █████████████████████████████████████████████████

20 █████████████████████████████████████████████████

21 █████████████████████████████████████████████████

22 █████████████████████████████████████████████████

23 ████ ████████████████████████████████████████████

24 █████████████████████████████████████████████████

25 █████████████████████████████████████████████████

26 █████████████████████████████████████████████████

27 █████████████████████████████████████████████████

28 ███ █████████████████████████████████████████████

1   ██████████████████████████████████████████████▪ ██

2   ████████████████████████████████████████████████

3

4   ██████████████████████████████

5       ████████████████████████

6     ██████████████████████████████████████████

7

8   ████████████████████████████████████████████████

9   ███████ ████████████████████████████████████████

10   ████████████████████████████████████████████████

11

12   ██████████████████████████ ██████████████████████

13   ████████████████████████████████████████████████

14   ████████████████████████████████████████████████

15

16   ████████████████████████ ████████████████████████

17   ██████████████████████████████████████████

18     ████████████████████████▪ ████████████████

19   ████████████████████████████████████████████████

20   ████████████████████████████████████████████████

21   ████████████████████████████████████████████████

22   ████████████████████████████████████████████████

23   ████████████████████████████████████████████████

24   ████████████████████████████████████████████████

25   ████████████████████████████████████████████████

26   ████████████████████████████████████ ██████████

27   _____

28   [6]Letters from ██████████████████.

    [7]Letter from ████████.



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 ████████████████████████████████████ ██

2 ████████████████████████████████████ ██

3 ████████████████████████████████████

4 ████████████████████████████████████

5 ████████████████████████████████████

6 ████████████████████  ████████████████

7 ████████████████████████████████████

8 ████████████████████████████████████

9 ████████████████████████████████████

10 ████████████████████████████████████

11

12 **7. Transition from Dutiful Employee to Getting Elected as Santa Cruz County Treasurer**

13 By 2012, Avatar/Rio Rico Properties was downsizing and decided to shutter all

14

15 offices besides its Scottsdale office.  The company soon shrank from 75 employees to

16 just three.  As one of the final three, Ms. Gutfahr knew her time there would soon come

17 to an end.  The oldest of the remaining employees volunteered to retire first because she

18

19 was eligible for Social Security in hopes of protecting Ms. Gutfahr and the other

20 remaining employee.  But it was of no use; soon Ms. Gutfahr was informed her layoff

21 was also imminent.

22

23 But there was a silver lining to losing her job.  Or so she was told.  ████

24 ████████████████████████████████████

25 ████████████████████████████  There would

26 therefore be a potential vacancy for the position.  ████████

27

28 ████████████████████████████████████

███████████████████████████████████████████████████████

That way, she could run for office right away and, if she won, would officially begin working as Treasurer on January 21, 2013.

With a total of 1,775 votes, she beat her primary opponents by exactly 400 votes. She went unopposed in the general election and won.[8]  And just like that, Ms. Gutfahr was Santa Cruz County Treasurer, despite having had no background or training in finance or accounting whatsoever.

### 8.  Post-Offense Conduct

Following the revelation of her misconduct in April 2024, many of Ms. Gutfahr's good friends and acquaintances ceased communication with her and now ignore her phone calls.  Several have suggested she might be better off dead.  But, fortunately, her family and closes friends have continued to offer their unwavering support.[9] ███

███████████████████████████████████████████████████████

███████████████████████████████ █  ████████████████████████

███████████████████████████████████████████████████████

████  There have been times when her family members have yelled at her: "How could you do this to us?" or "You've ruined our lives!"  But mostly they are scared about what is going to happen to her.  Over the past 14 months, Ms. Gutfahr has struggled with feelings of overwhelming shame and crippling remorse.  Her nonstop reflection on her

---

[8] *See* Primary Election, Election Summary Report (Aug. 28, 2012) at 2, available at:  https://www.santacruzcountyaz.gov/DocumentCenter/View/6232/08-28-12-Primary-Election-Results?bidId= (last accessed Jun. 4, 2025).

[9] Letters from ████████████████████████████████████████

[10] Letters from ██████████████████.

actions and questioning of her behavior borders on obsessive. She has exhibited real concern for—and a deep understanding of—the harm she has caused the residents of Santa Cruz County. She has written an open letter to the people of Santa Cruz County publicly apologizing to them for the harm she has caused everyone.[11] The immense impact of her crimes is not lost on her. She finds it difficult to comprehend her past behavior and expresses deep regret. As outlined in her letter to the Court, Ms. Gutfahr is committed to rectifying her mistakes to the best of her ability and seeking treatment for her underlying issues. By promptly pleading guilty, doing so at the earliest possible opportunity, Ms. Gutfahr aimed to spare her community further distress. Her decision to accept responsibility was immediate and without hesitation. She pled guilty pre-indictment and threw herself at the mercy of the justice system. She has cooperated in the court-appointed receivership process and has already helped to recover millions of dollars in restitution. She acknowledges her guilt, is prepared to accept the Court's sentence, and offers her apologies to the government, her family, and the victims. Having read and reviewed the impact statements, she fully recognizes the extent of the harm she has inflicted on so many and hopes to eventually earn forgiveness.

## IV.    FEDERAL SENTENCING FRAMEWORK

### A. The Sentencing Calculus, Generally

This Court must follow the three-step process set forth *Gall v. United States*, 522 U.S. 38 (2007). *See also* USSG §1B1.1(a)-(c) (Application Instructions). First, it must determine the proper guideline range. Second, it must determine whether to apply any of

---

[11]Letter from E. Gutfahr.

the guidelines' departure policy statements to adjust the guideline range.  Third, it must consider all factors set forth in 18 U.S.C. § 3553(a) and determine whether any variance is warranted.  *United States v. Vasquez-Cruz*, 692 F.3d 1001, 1006 (9th Cir. 2012); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (citation omitted).

**B. The Correctly Calculated Guidelines Range is, at Most, 97-121 Months and the Government's Contrary Guidelines Analysis Lacks Evidentiary and Legal Support.**

The PSR's calculated guidelines range of 151-188 months is disproportionate to the underlying conduct; it also includes a sentencing enhancement which must be eliminated for the reasons set forth in Ms. Gutfahr's previously submitted objections. (Doc. 25.)  The PSR calculates a total offense level of 33 which is premised upon: (1) a base offense level of 6; (2) a 22-level enhancement for a loss amount of $38.7 million; (3) an effective 4-level enhancement because "the offense resulted in substantial financial hardship" to the victims and resulting ineligibility for status as a Zero-Point Offender; (4) a 2-level enhancement for money laundering conviction under USSG §2S1.1(b)(2)(B); (5) a 2-level role adjustment to abuse of a position of public trust; and (6) a 3-level reduction for acceptance of responsibility under USSG §3E1.1.  (PSR ¶¶ 75-84.)  For the reasons stated in Ms. Gutfahr's objections, the enhancements for loss amount should be offset somewhat, and the enhancements for abuse of a position of trust and the substantial financial harm enhancement is inapplicable.  (Doc. 25 at 3-12.)  After offsetting and eliminating those inapplicable enhancements, and properly characterizing Ms. Gutfahr as a Zero-Point Offender, the correct total offense level is at most 29, yielding an advisory guidelines range of 87-108 months.  (*Id.* at 12.)

**C. Because of Their Extreme Focus on Loss, the Guidelines Are Unhelpful in Fashioning a Fair, Just, and Reasonable Sentence**

The parties are in agreement that Ms. Gutfahr misappropriated $38.7 million. (Doc. 12 at 5.)  But this Court should decline to impose a sentence driven by loss that calculation.

First, this is the type of case where the loss-impact enhancement means that the guidelines "fail to provide reasonable guidance," and are of no "help to any judge in fashioning a sentence that is fair, just, and reasonable."  *United States v. Adelson*, 441 F.Supp.2d 506, 515 (S.D.N.Y. 2006), *aff'd*, 301 F.App'x 93 (2d Cir. 2008).  "For the small class of defendants . . .  convicted of fraud offenses associated with very large guidelines loss calculations, the guidelines now are divorced from both the objections of section 3554(a) and, frankly, from common sense.  Accordingly, the guidelines calculations in such cases are of diminished value to sentencing judges."  Frank O. Bowman III, *Sentencing High-Loss Corporate Inside Frauds After* Booker, 20 Fed. Sent'g Rep. 167, 168 (2008).

Across the country, judges seem to agree: the Commission's own data shows there is an "increasing divergence between the average Guidelines minimum and the average sentence actually imposed as loss amount grows."  Mark H. Allenbaugh, *"Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sen'g Rep. 12, 22 (2013); *see also* Jillian Hewitt, *Fifty Shades of Gray: Sentencing Trends in Major White-Collar Cases*, 125 Yale L.J. 1018, 1025 (2016) (concluding that review of post-*Booker* sentencing data "empirically

corroborate[d] scholarly criticism that the loss table often vastly overstates the seriousness of an offense").

Second, more generally, the loss amount calculations do not bear the weight the guidelines give them. Under §2B1.1, in any modern white-collar case, loss has an inordinate and inappropriate effect on the calculation of the sentencing range that flies in the face of § 3553(a)'s statutory considerations. The loss table "frequently produces arbitrary and unduly severe sentences" because its "enhancements are so large that, in practice, they dwarf other potentially more relevant considerations." Hewitt, 125 Yale L.J. at 1032-1033.

As a result, like with narcotics sentences, "[s]omewhat between 50 and 70 percent of the Sentencing Guidelines calculation . . . is based on a single factor." Jed. S. Rakoff, *Why the Federal Sentencing Guidelines Should Be Scrapped*, 29 Fed. Sen'g Rep. 226, 227 (2017). "But it should be obvious that in a great many, perhaps most cases . . . the amount of the loss does not fairly convey the reality of the crime or the criminal." *Id.* "By making a guidelines sentence turn, for all practical purposes, on a single factor, the . . . Commission . . . effectively guaranteed that many such sentences would be irrational on their face." *Gupta*, 904 F.Supp.2d at 351; *see also United States v. Johnson*, 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018); *United States v. Parris*, 573 F.Supp.2d 744 (E.D.N.Y. 2008).

As a result, "[t]he higher the loss amount, the more distorted the guideline's advice to sentencing judges." *United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J., concurring). These issues are compounded by the fact that § 2B1.1 "was

not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices." *Id.* at 379-80 (describing history of amendments to guideline and noting that "[t]he history of bracket inflating directed by Congress renders the loss guideline fundamentally flawed"). As noted by the district court in the *Adelson* case:

> Where the Sentencing Guidelines provide reasonable guidance, they are of considerable help to any judge in fashioning a sentence that is fair, just, and reasonable. *But where, as here, the calculations under the guidelines have so run amok that they are patently absurd on their face*, a [c]ourt is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences.

441 F.Supp.2d at 515 (emphasis added). The guidelines place an "inordinate emphasis" on "putatively measurable quantities" like "the amount of financial loss in fraud cases," but they have failed to "explain[] why it is appropriate to accord such huge weight to such factors." *Id.* at 509; *Corsey*, 723 F.3d at 380 ("the low marginal utility of the guideline in this very high intended loss case should have prompted greater, not lesser, reliance on the section 3553(a) factors other than the guidelines").

Ms. Gutfahr urges this Court to focus more on the § 3553(a) factors that allow it to engage in the "uniform and constant" exercise "in the federal judicial tradition" of "consider[ing] every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).

**D. Alternatively, the Court May Apply the ABA Task Force's "Shadow Guidelines" Instead of the "Loss Amount" Calculations (USSG §2B1.1)**

It has been widely recognized by judges and commentators that the loss table in §2B1.1—which is also incorporated by reference into the money laundering guidelines via §2S1.1(a)(2)—produces unduly harsh sentences in economic crime cases. In recognition of that reality, an alternative approach to loss assessment has gained traction in recent years for such offenses, which this Court should consider applying here. Rather than apply the §2B1.1 enhancement as written, some federal judges have begun applying the so-called "Shadow Guidelines," which were proposed in 2014 by the ABA Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes.[12]

Among other things, the ABA proposal narrows the §2B1.1 loss amount from 15 tiers to 6 and decreases the enhancement for the highest loss amount from a 30-level increase to a 14-level increase. *Id.* at 2. Recognizing that the loss table focuses too much on trying to quantify something that is not easily quantifiable, *see supra*, federal judges throughout the country—particularly within the Second Circuit, where many high-loss amount fraud cases in this country are prosecuted—have begun applying the Shadow Guidelines rather than §2B1.1's loss calculations in many recent cases involving economic crimes. *See*, *e.g.*, *United States v. Faibish*, No. 12-CR-265-ENV (E.D.N.Y. Mar. 10, 2016) (applying Shadow Guidelines in case involving defendant convicted of

---

[12]*See* Am. Bar Ass'n, *A Report on Behalf of the American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes* (2014), attached hereto as **Exhibit A**. Please note that this exhibit is cited to sequentially and not according to the pagination within the document itself.

bank and securities fraud in amount of $32 million and imposing sentence of 63 months); *United States v. Litvak*, No. 3:13-CR-19-JCH (D. Conn., July 23, 2014) (applying Shadow Guidelines to sentence defendant to 24 months where guideline recommendation was 108-135 months); *United States v. Rivernider*, No. 3:10-CR-222-RNC (D. Conn. Dec. 13, 2013) (sentencing defendant convicted of 18 counts of wire fraud and conspiracy to commit wire fraud to sentence of 144 months' imprisonment as "preferable to" 324-405 month guidelines calculation, which "significantly overstated" defendant's culpability).    It is frankly difficult to comprehend why the guidelines adopt the increments in the frequency that it does:

**Table 1 – Loss Table (§2B1.1)**

| (1) If the loss exceeded $6,500, increase the offense level as follows: | |
|---|---|
| **LOSS (APPLY THE GREATEST)** | **INCREASE IN LEVEL** |
| (A)  $6,500 or less | no increase* |
| (B)  More than $6,500 | add **2** |
| (C)  More than $15,000 | add **4** |
| (D)  More than $40,000 | add **6** |
| (E)  More than $95,000 | add **8** |
| (F)  More than $150,000 | add **10** |
| (G)  More than $250,000 | add **12** |
| (H)  More than $550,000 | add **14** |
| (I)  More than $1,500,000 | add **16** |

It is also hard to justify drawing arbitrary lines of distinction when categorizing the severity of financial crimes like this.  Dollar amounts alone cannot drive the train.  The lines drawn in the loss table can be seen as random and not justified, which the Shadow Guidelines acknowledge by reducing the frequency of enhancement (*i.e.*, how many

different tiers there are) as well as the maximum available enhancement based purely on value.

As illustrated in the Shadow Guidelines loss table below, in cases where, as here, the loss exceeds $10 million, it imposes a 12-level enhancement whereas cases exceeding $50 million would be assessed a maximum 14-level enhancement:

**Table 2 – Shadow Guidelines Loss Table**

(1) **Loss**.  If the loss exceeded $20,000, increase the offense level as follows:

| | |
|---|---|
| (A) More than $20,000 | add [4] |
| (B) More than $100,000 | add [6] |
| (C) More than $1,000,000 | add [8] |
| (D) More than $5,000,000 | add [10] |
| (E) More than $10,000,000 | add [12] |
| (F) More than $50,000,000 | add [14] |

It is respectfully recommended that the Shadow Guidelines more appropriately comprehend that losses between $10-50 million presumptively warrant similar punishment, and that it is not until more than $50 million in losses that a defendant should be penalized to any greater degree.

Applying the Shadow Guidelines in this case, even accepting the loss amount of $38.7 million without discounting the millions of dollars in restitution that have already been returned through the state court receivership—which could be potentially as high as $13,528,610.00 according to the most recent report submitted to the judge in the state court receivership matter—a smaller enhancement for loss amount than what is called for under §2B1.1 is warranted.  That would result in a total offense level of 25, yielding a

range of 57-71 months for a Category I offender, *see infra*, which is even lower than the 63-78 sentence recommended herein.

### E.  Application of the Shadow Guidelines to the Instant Case

#### 1.  Loss Amount

A loss amount of $38.7 million triggers a 12-level enhancement under the Shadow Guidelines as opposed to the 22-level enhancement called for under §2B1.1(b)(1)(L). The addition of 12 levels rather than 22 levels is more consistent with the commentary to §2B1.1, which states: "[t]here may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense.  In such cases, a downward departure may be warranted."  USSG §2B1.1, Application Note 20(c).  While Ms. Gutfahr does not seek a downward departure in this case, the Court may consider the commentary when analyzing the § 3553(a) factors.  *See United States v. Rosen*, 726 1017, 1027 (7th Cir. 2013); *United States v. Burgos*, 2015 WL 6447766 (N.D. Ind. Oct. 23, 2015).

#### 2.  Culpability

The Shadow Guidelines then provide for five different levels of culpability, which account for a wide range of factors including (1) the motive/nature of the offense, (2) the correlation between the amount of loss and the amount of gain, (3) the degree to which the offense and the defendant's contribution were sophisticated, (4) extenuating circumstances in connection with the offense, (5) whether the defendant initiated the defense or merely joined in criminal conduct initiated by others, and (6) whether the defendant took steps to mitigate the harm from the offense.  (Ex. A at 3-7.)

Although the authors of the Shadow Guidelines acknowledge that "these various factors will often overlap," the "end result of the court's analysis should be a culpability level that 'ranks' the defendant in the hierarchy of five levels of culpability for all defendants." (Ex. A at 3.) They go on to state that, "[a]s a way of assisting the court in making the culpability assessment, it is anticipated that the middle culpability category – 'moderate culpability' – would account for the largest number of defendants." (Ex. A at 4.) Each of the six factors in terms of assessing culpability, as applied to the unique facts and circumstances of this case, is addressed below:

- *Motive/Nature of the Offense* – In assessing the motive/nature of the offense, the Shadow Guidelines provide four general categories that may be appropriate to describe an offender's conduct: (a) predatory, (b) legitimate *ab initio*, (c) risk shifting, and (d) gatekeeping. The most culpable of these varying levels—*i.e.*, predatory—is appropriate in this case since the offense was "intended to inflict loss for the sole or dominant purpose of generating personal gain" to the defendant. (Ex. A at 4.)

- *Gain* – Three relevant considerations govern the culpability assessment to the defendant's gain: (a) commensurate with loss, (b) less than loss, or (c) minimal or zero loss. Here, Ms. Gutfahr's gain was substantial. She took $37.8 million dollars which did not belong to her and used it for her own benefit for nearly ten years. However, much of the property she purchased with the stolen funds has been turned over to the court-appointed receiver and it is anticipated that between $10.7 million and $13.5 million will be recovered. More than $5.9 million has already been returned to the County thus far, and the receivership process remains ongoing. The top category still appears to be most appropriate for Ms. Gutfahr's crimes, notwithstanding that she derived a gain in an amount less than the total loss involved. (Ex. A at 5-6.)

- *Degree of Sophistication/Organization* – The instant offense conduct involved some sophistication, which is reflected in the plea agreement's stipulation to a sophisticated means enhancement under §3B1.3. That said, it bears emphasizing that the fraud scheme was shockingly stupid and done out in the open. A simple review of publicly available financial records would have immediately uncovered the crime. (Ex. A at 6.)

- *Duration* – The instant offense conduct spanned a long period of time, close to a decade. (Ex. A at 6.) Even the government will agree, however, that the embezzlement should have been discovered in a matter of mere months, not years.

- *Extenuating Circumstances* – The extenuating circumstances in this case are plentiful, as outlined throughout this memorandum. This includes the fact that this case constitutes Ms. Gutfahr's first and only arrest ██████ ████████████████████████████████████████████████████████ ██████████████████████████████████████.[13]  She began to embezzle funds during a tumultuous period in her personal life when she became obsessed with the deluded idea of creating an idyllic, seemingly "perfect" life for her family. (Ex. A at 7.)

- *Efforts to Mitigate Harm* – As discussed throughout this motion, Ms. Gutfahr has done everything in her power to place herself on the path towards redemption. She worked with the government and pled guilty pre-indictment, she threw herself at the mercy of the Court and has cooperated with the court-appointed receivership to recover as much of the stolen funds as possible. She has publicly apologized to the people of Santa Cruz County and is ready to accept whatever sentence this Court imposes. She has plainly made significant efforts to mitigate harm within the meaning of the Shadow Guidelines. (Ex. A at 7.)

In evaluating culpability overall, the instant offense involved behavior that was predatory, sophisticated, and spanned a long period of time. However, the Court must equally consider the other extenuating circumstances presented and the "less than loss" level of gain insofar as Ms. Gutfahr's illicit gains must be offset, at least somewhat, by the millions of dollars (and counting) she has voluntarily returned through the court-appointed receivership process. It cannot be said that she falls into the "Lowest" category of culpability; however, she should be regarded as a "Moderate" level of culpability, which pursuant to the Shadow Guideline, would add 0 levels to her

---

[13] ████████████████████████████████████████████████████████ ██████████████████████████████

sentencing calculation.  Were she to be regarded as "High" culpability, she would receive a between 3-5 level increase to her offense level.

### 3.  Victim Impact

Next, the Shadow Guidelines provide four different levels of victim impact: Minimal (0 levels), Low (add +2), Moderate (add +4), and High (add +6).  (Ex. A at 2.) The application notes describe four different factors to consider when determining the impact of the defendant's actions on the victims.  The categories include (a) vulnerability of the victims, (b) significance of loss, (c) other non-economic harm, and (d) victim inducement of offense.  (Ex. A at 2.)

Conducting the victim impact analysis in this case is an extremely complex and multifaceted undertaking.  (*See* Doc. 25 at 3-12.)  The true victims are, of course, the taxpayers themselves.  But the statutory victim for restitution purposes is the Santa Cruz County Board of Supervisors.  There is no question that the Board of Supervisors was wronged, nor is there any question that it is justifiably outraged towards Ms. Gutfahr for what she has done.  Her actions impacted the Board in many ways, both financial and political.  So much litigation, mudslinging, and finger pointing has been generated because of her crimes.  The fallout is hard to quantify.  But bodies politic such as the County and its Board of Supervisors are not thought of as victims in the traditional sense. While governmental agencies may qualify for restitution as a "victim" under parallel restitution statutes,  "[t]he term 'victim' does not, include the federal government or any state, local, tribal, or foreign government or agency thereof."  U.S. Sent'g Comm'n, *Primer     on     Crime     Victims'     Rights*     (2024)     at     2,     *available     at*

*https://www.ussc.gov/sites/default/files/pdf/training/primers/2024_Primer_Crime_Victims.pdf*; *see also* 1 U.S.C. § 1; 18 U.S.C. § 3664(j); *United States v. Ekanem*, 383 F.3d 40, 42-43 (2d Cir. 2004).

Notwithstanding the fact that local governments or agencies are not victims in the traditional sense, to the extent that Ms. Gutfahr's "victims" suffered a large financial loss, with complex and long-lasting repercussions, the loss amount of $38.7 million sufficiently accounts for these considerations. The loss amount is the main driving force behind Ms. Gutfahr's punishment. (Ex. A at 7) ("The court should be cognizant that the amount of the victim(s)' loss is already accounted for and should not be counted again in the context of victim impact. An additional score for victim impact is appropriate only when there is harm beyond that inherent in the amount of the loss."). But Ms. Gutfahr's crimes have impacted the Board in some ways that are not strictly financial; therefore, a "Minimal or None" categorization appears inappropriate, especially when considering the significance of the non-economic harm endured.

Here, the Board of Supervisors has suffered a loss of reputation, damage to constituents, political fallout, and incurred distrust from the community due to its lack of fiscal oversight. Some harm beyond the amount of loss itself must be accounted for; however, adding too many points to Ms. Gutfahr's calculation under this subsection would be contrary to the application notes and could constitute double counting. Thus, pursuant to the Shadow Guidelines, this Court should classify the victim impact as no more than "Moderate" and add 4 points. Were the victim impact regarded as "High," a 6-level increase to offense level would be assessed.

### 4. Special Offense Considerations

The Shadow Guidelines adopt as special offense considerations the factors listed in §2B1.1(b)(3)-(9), (11)-(14), and (16-18).  (Ex. A at 2.)  For each of these considerations, a 2-level increase is applied if the concern has not already been addressed elsewhere in determining the offense level.  In this case, as agreed upon by the parties in the plea agreement, the following special offense considerations would apply: a 2-level enhancement for sophisticated means under §2B1.1(b)(10)(C) and a 2-level enhancement for abuse of a position of trust under §3B1.1.  (Doc. 12 at 5.)  Thus, the Court should add at most an additional 4 levels for "special offense considerations" to incorporate specific congressional directives.  (Ex. A at 2.)

### 5. Offense Level Cap of 10 for Non-Serious Offenses by First Offenders

Although this is Ms. Gutfahr's first offense, it would be inappropriate to categorize her as a not "otherwise serious" offender as defined under 28 U.S.C. § 994(j).[14] Section 994(j) ensures the guidelines allow for nonviolent or otherwise less serious offenders to receive a non-custodial sentence.  This is not a case where, considering the offense, the circumstances support a judicial finding that the offense was not serious or that a sentence other than imprisonment is generally appropriate.  (Ex. A at 2, 8-9.)  Thus, the 10-level cap on offense level would not apply in this case.

---

[14]Subsection (j) of § 994 contains a specific congressional directive that "[t]he Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense, and the general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury."

### 6.  Final Calculation Under the Shadow Guidelines

The calculation rendered by application of the Shadow Guidelines weighs in favor of the sentence recommended herein for Ms. Gutfahr in this case.   The Shadow Guidelines range, as applied to the case at bar, should be calculated as follows:

**Table 3 – Shadow Guidelines Calculation**

CT. 1: EMBEZZLEMENT BY A PUBLIC OFFICIAL, CT. 2: MONEY LAUNDERING & CT. 3: TAX EVASION

| | | |
|---|---|---|
| (a) | Base Offense Level | add [6] |
| (b) | Special Offense Characteristics | |
| | (b)(1) Loss | add [12] |
| | (b)(2) Culpability (Moderate) | no change |
| | (b)(3) Victim Impact | add [4] |
| (c) | Special Offense Considerations (§2B1.1(b) factors) | |

| §2B1.1(b)(10)(C) | Sophistication | add [2] |
|---|---|---|
| §2S1.1(b)(2)(B) | Money Laundering | add [2] |
| §3B1.3 | Position of Trust | add [2] |
| §3E1.1 | Acceptance | subtract [3] |

**Total Offense Level                    subtotal [25]**

As discussed in Section IV.C., *supra*, given the fundamental dysfunction of the guidelines in high loss cases, federal judges have begun to rely on the Shadow Guidelines to support sentences that are more rational, more just, and more appropriate.   For example, in *Faibish*, where the defendant and his co-conspirators funneled a staggering $1.3 billion in a check kiting scheme, the district court rejected the guidelines sentence of 80 years and instead imposed a 63-month sentence by relying on the Shadow Guidelines under § 3553(a), stating: "The Court also takes notice that the [ABA] Task Force on the

34

Reform of Federal Sentencing for Economic Crimes offers an alternative model to consider in sentencings for crimes of the stripe committed by Faibish." *Faibish*, No. 12-CR-265-ENV, *citing* Robert J. Anello and Richard F. Albert, *Rise of ABA Task Force's "Shadow Sentencing Guidelines*," N.Y.L.J., Vol. 255, No. 64, at 2 (Apr. 5, 2016) (citations omitted).  The court concluded that "while the current guidelines system does not provide a reasonable way to . . . try to provide fair and just punishment . . . the ABA Task Force guidelines certainly significantly move in that direction." *Id*.  The court also stated that the analysis under the Shadow Guidelines was "fairly reflective of what a court is required to do under section 3553(a)" and that to follow the Shadow Guidelines "is what is most reasonable here." *Id.*  The judge explained that like "a whole host of judges who ha[ve] said so publicly and scores of others who have . . . grumbled about it privately," it believed "the guidelines . . . are just mindlessly accelerated once you have numbers of any size added to the loss or gain table" and, thus, refused to "peg Faibish's fate to a guidelines-computed loss amount."  *Id.*; *see also United States v. Shapiro*, 14-CR-399-ENV, 2022 WL 2758129, at *1 (E.D.N.Y. July 14, 2022) (noting that, at sentencing, district court did not apply guidelines' loss table because they "are pegged to unhinged economic loss figures that mindlessly accelerate the resulting sentencing range" and instead "fashion[ed] its sentence based on the 'shadow guidelines' recommended by the ABA"), *citing United States v. Faibish*, No. 12-CR-265-ENV, 2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015); *see also United States v. Bayfield*, 796 Fed.Appx. 19, 22-24 (2d Cir. 2019) (discussing with approval district court's reliance on Shadow Guidelines in determining sentence).

In *Rivernider*, the defendant was convicted at trial of 18 counts of wire fraud and conspiracy to commit wire fraud.  At sentencing, the district court similarly stated the Shadow Guidelines calculation of 144 months was "preferable to" the 324-405 month calculation under the guidelines because it "significantly overstate[d]" the defendant's culpability.  *Rivernider*, 3:10-cr-222 (D. Conn. Dec. 18, 2013) RT (Sent'g Hrg.), at 206:10-13, 212:5-14; *see also United States v. Rivernider*, 828 F.3d 91, 114 (2d Cir. 2016) (noting district court "considered—among other factors—the rationale of the ABA report in concluding that the guidelines loss amount overstated the seriousness of [the defendant's] offense" and that court's use of Shadow Guidelines to impose a below-guidelines sentence "is easily located within the range of permissible decisions" federal judges can make when crafting an appropriate sentence) (quotation omitted).

And in *Litvak*, the district judge studied the Shadow Guidelines and was in "complete agreement with the drafters of this proposal, some of whom are highly regarded judges in this circuit, in which the drafters urge the courts not to focus on things that are easily quantifiable" like dollar amounts; thus, despite a guideline range of 108-134 months, the court sentenced the defendant to 24 months in prison.  255 N.Y.L.J 64 at 2; *see also United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015) (reversed and remanded for new trial on independent grounds).

There have been increasing calls for the Commission to reconsider the weight the guidelines give to loss amounts in determining the offense level for economic offenses. Section 2B1.1's loss table, and the resulting sentencing enhancements it doles out, often lead to inequitable sentencing outcomes because the amount of loss does not necessarily

correlate to the moral seriousness of the offense or other § 3553(a) factors. In white collar cases with substantial loss amounts such as this, deemphasizing the reliance on loss amount leads to more just outcomes and promotes fair and uniform sentencing, given the evolving practices of sentencing courts in recent years. For these reasons, as well as the other reasons cited herein, it is respectfully recommended that this Court sentence Ms. Gutfahr somewhere in the 63-78 month range, using the Shadow Guidelines in conjunction with other sentencing considerations as a more apt barometer of appropriate punishment.

## V.    A BELOW-GUIDELINES SENTENCE ALONG WITH SUBSTANTIAL COMMUNITY SERVICE OBLIGATIONS IS APPROPRIATE

Whether or not the Court adopts the PSR's recommended guideline calculations, a substantially below-guidelines sentence is both just and appropriate in this case. Indeed, recognizing the facial unreasonableness of a 135–168 month sentence for someone with Ms. Gutfahr's age and health condition, the PSR recommends a variant sentence of 120 months' imprisonment. However, a ten-year prison sentence is still far harsher than necessary to satisfy the § 3553(a) factors and contrary to the interests of justice. It is respectfully recommended that a sentence substantially below the guidelines range—to include at least three years of rigorous community service while on supervised release—is sufficient but not greater than necessary to accomplish the purposes of sentencing.

### A. Substantial Variance from the Guidelines is Permitted, Appropriate, and Warranted Here

As referenced above, the guidelines are only the starting point of the sentencing analysis. This Court does not presume a guidelines sentence is reasonable and, instead,

must conduct its own independent review of the sentencing factors.  The Court has wide latitude to vary from the guidelines based upon the factors enumerated in § 3553(a) to ensure the punishment "fit[s] the offender and not merely the crime."  *Pepper v. United States*, 562 U.S. 476, 487-88 (2011), *quoting Williams v. New York*, 337 U.S. 241, 247 (1949).  This Court should exercise that discretion here.

When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to issue guidelines that "assure the meeting of the purposes of sentencing," 28 U.S.C. § 991(b)(1)(A), but the Commission could never agree on which purposes should predominate; for example, whether principles of just deserts should be given greater weight than incapacitation.  Instead, the Commission decided to take its cue from past practices; it issued guidelines that it claimed were based on an empirical study of prior sentences imposed. *See* USSG, Ch. 1 pt. A(3) (1987); Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 7 (1988).  The theory was that the purposes that judges had previously relied upon in imposing sentences in criminal cases—the purposes implicit in the federal criminal justice system tradition—would be their guide in creating the guidelines.  But, in fact, the guidelines that the Commission created did not always accurately reflect past practices in all instances.  The loss table is but one example.

Numerous sentencing courts in the District of Arizona and elsewhere have imposed sentences significantly below the guidelines range in economic crime cases where, as here, the range is out of touch with the facts and circumstances presented.  Indeed, a sentence within the guidelines range in this case would result in dramatic

unwarranted disparities under § 3553(A)(6) because the range urged by the PSR dwarfs the sentences handed down in cases with circumstances far more egregious than present here: conduct involving extortion, threats, violence, weapons, forcible sexual assault, child sexual exploitation collaboration with criminal organizations or syndicates, etc. Further, because of Ms. Gutfahr's ██████████, the guidelines range would effectively call for the most draconian punishment of all short of the death penalty: a natural life sentence.

## B. The Guidelines Are Not an Appropriate Guide for Actual Sentencing Practice in This Case

Consistent with the recognition that the guidelines do not control sentences, the United States Supreme Court has noted that a district court may issue a non-guidelines sentence "based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (citations omitted). Sentences governed by §2B1.1 loss amount calculations are an approach "unknown to other sentence systems," and while it was one the Commission was entitled to adopt, "its unusualness is a circumstance that a sentencing court is entitled to consider" when imposing a below-guidelines sentence. *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (citation omitted).

Indeed, despite the application by judges of the guidelines for decades, a sentence based on §2B1.1 loss amounts does not accurately reflect actual sentences in embezzlement cases. The average and median sentences for fraud/theft/embezzlement offenses in the District of Arizona are a tiny fraction of the recommended guidelines

range here.   For example, between fiscal years 2015-2024, the average sentence for defendants in Criminal History Category I for such offenses in this district was nine months, and the median was three months among the 844 defendants sentenced to a term of incarceration.[15]

### Table 4 – White Collar Sentences (D. Ariz.)



**Average and Median Imprisonment Length**
Fiscal Year 2015,2016,2017,2018,2019,2020,2021,2022,2023,2024

The figure includes the 844 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) were included in the sentence average computations as 470 months. The information in this figure does not include probation or conditions of confinement as described in USSG §5C1.1.
**FILTER:**
Fiscal Year: 2015,2016,2017,2018,2019,2020,2021,2022,2023,2024; Circuit: All; State: All; District: Arizona; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: Fraud/Theft/Embezzlement; Guideline: All; Drug Type: All; Sentencing Zone: All; Criminal History: I; Career Offender Status: All

In other words, it is flat-wrong to presume the guidelines provide useful guidance to avoid sentencing disparity here.

When the Commission formulated guidelines for white collar crimes, it departed from "empirical data and national experience," and, in so doing, it departed from its "characteristic institutional role." *Kimbrough*, 522 U.S. at 109.  In the years since 1987, the Loss Table has only become more distorted by the effects of inflation; the recommended punishment for many loss amounts has effectively doubled since

---

[15]*See* U.S. Sentencing Comm'n, Interactive Sourcebook, available at https://ida.ussc.gov/analytics/saw.dll?Dashboard (last accessed May 19, 2025).

inception.  And finally, the Commission's own data shows that the guidelines continue to recommend sentences far above the sentences imposed in most cases.  In this context, to impose a guidelines sentence—or one that is substantially influenced by the guidelines—in this case would be to create a serious sentencing disparity and yield an unjust result.

**C. Ms. Gutfahr's ████ ███ █████ ████████████ Militate Against a Substantial Sentence of Incarceration**

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████    While she is not seeking any downward

departures, the same logic can be applied in assessment of variance under § 3553(a).

**D. Ms. Gutfahr's History and Characteristics Militate Against a Substantial Sentence of Incarceration**

The "history and characteristics of the defendant" also support a below-guidelines

sentence. 18 U.S.C. § 3553(a)(1). As discussed in detail above, Ms. Gutfahr's life has

been one of hard work and dedication to caring for and helping her family and others in

need. She helped ███████████████.[17] She has taken care of the sick and the elderly.

She helped ████████████████████████████████████

████████████████████████████. Until her conviction marred her good

---

[17] Letter from ███████████.

reputation in the community, her career and life were celebrated mainly for her work on behalf of those in need.[18]  And yet she has forsaken so much of that through her criminal conduct in this case.  It is simply impossible to reconcile her crimes with who she is as a human being.  Ms. Gutfahr has no criminal history, and before this case, lived an upstanding life devoted to family, community, public service, and her religious faith. Many of her friends and colleagues have since turned their backs on her, and others have had to distance themselves due to ongoing civil litigation.  But Ms. Gutfahr's innermost circle of family and close friends continue to voice their support of her.  She has more to give to society beyond rotting in a prison cell for the rest of her life.  Her family and close friends cherish her, and she cherishes them.  She begs this Court not to permanently separate them.

### E. Substantial Incarceration is Not Required to Reflect the Nature, Circumstances, and Seriousness of the Offense or to Provide Just Punishment for the Offense

The "nature and circumstances of the offense" and the "need for the sentence imposed . . . to reflect the seriousness of the offense . . . and to provide just punishment for the offense" under § 3553(a)(1) & (a)(2)(a) also support a below-guidelines sentence. There is no doubt that Ms. Gutfahr's crimes are serious.  On the one hand, the annual budget of the Santa Cruz County Board of Supervisors is at least approximately $100 million, although the draft PSR listed the annual budget as $1 billion.  (PSR ¶ 74; *but see* Draft PSR ¶ 72.)  Over the span of about a decade, Ms. Gutfahr stole $38.7 million.

---

[18]Letter from ███████████.

County services continued unabated during and after the thefts were committed. Whatever the annual budget was, the County will persevere.

On the other hand, the real victims are the taxpayers who had their hard-earned money misappropriated and spent, not on public good for everyone's benefit, but on unjustly enriching Ms. Gutfahr. Her crimes can best be understood as the result of her longstanding vulnerabilities, interacting with a permissive environment with little to no oversight from regulators, and escalating personal obligations, which culminated in disorganized, emotionally driven decisions, rather than calculated misconduct. Frankly, Ms. Gutfahr had no business ever becoming the Treasurer in the first place. Her crimes have undermined confidence in our system of government as a whole; as a society, we all agree to pay taxes (which nobody loves doing) with the understanding that those funds will be protected and spent for the betterment of all. We cannot tolerate our elected officials taking tax money and using it for themselves, and for that, Ms. Gutfahr deserves to be punished.

But Ms. Gutfahr's conduct should also be considered in context and filtered through her role. She was a person suffering from severe depression and diminished capacity who was elected to run the county treasurer without any real business experience or training in finance. Local government in Santa Cruz County has a long history of financial mismanagement. The landfill district has been investigated, the auditor's office has been investigated, the assessor's office has been investigated, the sheriff's office has

been investigated, and the county attorney's office has been investigated.[19]  The list goes on.  Against that backdrop, it became apparent that nobody was paying attention as they should have been.  Ms. Gutfahr deluded herself into a pipedream whereby she thought she could borrow surplus funds to establish successful real estate and cattle businesses and then repay the money with everyone (her family included) being none the wiser.  It was obviously an illegal and ill-conceived idea, but Ms. Gutfahr was not thinking clearly.  While it absolutely does not excuse fraud of any kind, this perspective provides useful context for the circumstances of the offense conduct, as § 3553(a) requires.

In sum, despite the talk of fancy ranches, seaside condos, and luxury vehicles, Ms. Gutfahr committed one of the dumbest, ill-conceived, short-sighted, and most audacious crimes in Arizona state history.  Her scheme was not well-planned.  She made no real effort to conceal her actions.  Even a cursory review of financial records or publicly-available information would have quickly uncovered her crimes.  But nobody bothered to look or ask questions, so what should have been discovered in a matter of months continued unabated for more than a decade.  Was nobody looking?  Was nobody asking questions?  Not a single raised eyebrow?  It is truly hard to fathom.  The fact that Ms.

---

[19]*See, e.g.*, KGUN9 News, *Arizona AG accuses long-time Santa Cruz Sheriff of overtime scheme*, (June 3, 2021), https://www.kgun9.com/news/local-news/arizona-ag-accuses-long-time-santa-cruz-sheriff-of-overtime-scheme; Paul Ingram, *Former Santa Cruz County assessor pleads guilty to conspiracy, bribery*, Tucson Sentinel (Apr. 28, 2022), https://www.nogalesinternational.com/news/officials-report-alleged-theft-in-county-attorney-s-office/article_518be208-fe1b-11ef-a982-0f0dc3e851a2.html; Nogales International, *Officials report alleged theft in County Attorney's Office*, (Apr. 20, 2025), https://www.nogalesinternational.com/news/officials-report-alleged-theft-in-county-attorney-s-office/article_518be208-fe1b-11ef-a982-0f0dc3e851a2.html.

Gutfahr's crimes went undetected for as long as they did, and that the total amount added up to the staggering sum that it did, is frankly also an indictment of the lack of sufficient fiscal oversight in Santa Cruz County in general. Changes have undoubtedly been put in place to make sure something like this can never happen again. Whether anyone else in a position of authority should also be held accountable will ultimately be up to the voters to decide. But it does not follow that merely because the amount stolen was left to grow to the amount that it did, that justice dictates Ms. Gutfahr must face draconian punishment to be held sufficiently accountable.

**F. Neither Specific nor General Deterrence is Best Served by a Substantial Sentence of Imprisonment, nor is it Needed to Protect the Public and to Promote Respect for the Law**

A below-guidelines sentence would reflect the needs for "adequate deterrence to criminal conduct," to "protect the public from further crimes of the defendant," and to "promote respect for the law," as required by § 3553(a)(2)(A)-(C).

First, Ms. Gutfahr is never going to commit any future offenses. Indeed, this case constitutes her first and final fall into the criminal justice system. Those close to her see her crimes as shocking departures from her ordinary law-abiding life. She will never manage finances or handle others' money ever again for the rest of her life.

Second, the punishment Ms. Gutfahr has already faced pre- and post-plea amply satisfy the objectives of both specific and general deterrence. She has already suffered extreme public shame, harassment, and upheaval, and her family's finances and reputation have been destroyed, likely for the rest of their lives. As noted above, ███

███████████████████████████████████████████████████████████████████

███████████████. She has been the target of public outcry and will forever live in infamy. She will never be in a position of trust or hold public office again. She will live the rest of her days as a social outcast, whether inside or outside a prison cell.

Moreover, Ms. Gutfahr ████████████████████████. She will not be a recidivist. Given her advanced age, ████████████████, and lack of criminal history, she poses no legitimate risk to recidivate. (Ex. C at 15-17.) Statistically speaking, defendants much younger than her (*e.g.*, defendants over 40 years old) are particularly suited for non-guidelines sentences given that they exhibit much lower rates of reoffending as compared to younger defendants. This is especially true for female offenders.[20] And empirical evidence indicates that even short sentences send a strong message to potential white-collar offenders. *See Adelson*, 441 F.Supp.2d at 514 (describing "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar offenders'"); Richard S. Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U.L.J. 485, 492 (1999); U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing* 56 (2004) (available at https://www.ussc.gov/research/research-and-publications/research-projects-and-surveys/fifteen-years-guidelines-sentencing (last accessed May 19, 2025) (noting that guidelines were written, in part, to "ensure a *short but definite* period of confinement for a larger proportion of these 'white collar' cases,

---

[20]*See* U.S. Sent'g Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview* (2016) at 23, available at https://www.ussc.gov/research/research-reports/recidivism-among-federal-offenders-comprehensive-overview (analyzing all federal offense types, including fraud offenses) (last accessed May 19, 2025).

both to ensure proportionate punishment and to achieve deterrence") (emphasis added). *Cf. United States v. Tomko*, 562 F.3d 558, 573, 582 (3d Cir. 2009) (declining to adopt government's argument that district court's probation-only sentence in complex securities fraud case, which government described as a "100% downward variance," would harm general deterrence ideals).

### G. A Sentence of Substantial Incarceration is Likely to Result in Unwarranted Sentencing Disparities

The Court must also consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). This case is one-of-a-kind. It will be impossible to replicate in the future. The Ninth Circuit has repeatedly noted that a district court's obligation to impose a sentence that is sufficient but not greater than necessary includes the need to avoid unwarranted sentencing disparities. *United States v. Autery*, 555 F.3d 864, 873-78 (9th Cir. 2009). In this regard, the Court must consider similarly situated defendants in other cases. This is a difficult task to perform here because there are very few cases like this one. In fact, a sentence of substantial incarceration in this case is likely to cause the kind of disparities proscribed, particularly because, unlike many similarly situated defendants, Ms. Gutfahr pled guilty immediately and cooperated in returning millions of dollars (and counting) of misappropriated funds. This case is an outlier for many reasons, not the least of which is the scale of the amount embezzled and the otherwise virtuous life the defendant has lived. However, as the many cases cited above demonstrate, *see infra*, below-guideline sentences are the norm in high dollar white-collar offenses.

## VI.   CONCLUSION

Based upon the foregoing, the sentencing factors enumerated in § 3553(a), as applied to the circumstances of this defendant and this case, justify a below-guidelines sentence that accounts for Ms. Gutfahr's lifetime of good deeds and care for others, the nonexistent likelihood of her reoffending, the efforts she has made since her crimes were discovered to make things right, ███████████████████, and the collateral consequences she has and will endure as a result of her convictions.  This Court should send Ms. Gutfahr to prison, but not for a time tantamount to a life sentence.  She does not deserve that.   Ms. Gutfahr is prepared to serve whatever sentence this Court deems appropriate, even if that means serving the statutory maximum.  She so desperately wants to make things right as best as she can, and she knows being sentenced to prison is a major part of that.  This Court should find that a sentence of **63-78 months followed by three-years of supervised release** strikes the right balance and is sufficient but not greater than necessary.

RESPECTFULLY SUBMITTED this 16th day of June, 2025.

Law Office of
**HERNANDEZ | HAMILTON | LAMOUREUX**

*s/Joshua F. Hamilton*
JOSHUA F. HAMILTON
Attorney for Defendant Gutfahr

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I, Linda Yrrizarry, hereby certify that on this 16th day of June, 2025, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing was sent to the following recipients:

Honorable Rosemary Marquez
United States District Court

Nicholas W. Cannon, Senior Litigation Counsel
United States Department of Justice

Jane L. Westby, Assistant
United States Attorney's Office

Willow Stokes, Senior Officer
United States Probation Department

By *s/Linda Yrrizarry*
    LINDA YRRIZARRY

# EXHIBIT "A"

*A Report on Behalf of The*
*American Bar Association*
*Criminal Justice Section Task Force*
*on The Reform of*
*Federal Sentencing for Economic Crimes*

*Final Draft*
*November 10, 2014*

*\*The views stated in this submission are presented on behalf of the Criminal Justice Section. The report has not been approved by the House of Delegates or the Board of Governors of the American Bar Association and therefore may not be construed as representing the policy of the American Bar Association.*

## Economic Offenses

(a)     **Base Offense Level**:                    [6-8]

(b)     **Specific Offense Characteristics**

    (1) **Loss**.  If the loss exceeded $20,000, increase the offense level as follows:

| | |
|---|---|
| (A) More than $20,000 | add  [4] |
| (B) More than $100,000 | add  [6] |
| (C) More than $1,000,000 | add  [8] |
| (D) More than $5,000,000 | add  [10] |
| (E) More than $10,000,000 | add  [12] |
| (F) More than $50,000,000 | add  [14] |

    (2) **Culpability**

| | |
|---|---|
| (A) Lowest culpability | subtract [6-10] |
| (B) Low culpability | subtract [3-5] |
| (C) Moderate culpability | no change |
| (D) High culpability | add [3-5] |
| (E) Highest culpability | add [6-10] |

    (3) **Victim Impact**

| | |
|---|---|
| (A) Minimal or none | no increase |
| (B) Low | add [2] |
| (C) Moderate | add [4] |
| (D) High | add [6] |

(c)     **Special Offense Considerations**

For offenses of a kind specified in Section 2B1.1(b)(3) through (9), (11) through (14), or (16) through (18), the court should consider those offense characteristics to the extent they are appropriate in determining culpability or victim impact.  Where the offense presents a special concern of the kind intended to be addressed by these subsections, and where the concern has not been addressed in determining the offense level, increase by 2 offense levels. [incorporate specific Congressional directives].

(d)     **Offense level cap of 10 for non-serious offenses by first offenders**

If the defendant has zero criminal history points under Chapter 4 and the offense was not "otherwise serious" within the meaning of 28 U.S.C. § 994(j), the offense level shall be no greater than 10 and a sentence other than imprisonment is generally appropriate.

_Application Notes_:

1.    _Loss_:

[To be incorporated from current 2B1.1 with the modification that loss means actual loss].

2.    _Culpability_:

_Consideration of the various culpability factors_

The guideline has 5 levels of culpability that range from lowest to highest. The appropriate culpability level for any given case will depend on an array of factors. These include, but are not limited to: the defendant's motive (including the general nature of the offense); the correlation between the amount of loss and the amount of the defendant's gain; the degree to which the offense and the defendant's contribution to it was sophisticated or organized; the duration of the offense and the defendant's participation in it; extenuating circumstances in connection with the offense; whether the defendant initiated the offense or merely joined in criminal conduct initiated by others; and whether the defendant took steps (such as voluntary reporting or cessation, or payment of restitution) to mitigate the harm from the offense. The list is not exclusive. Other factors may also bear on the culpability level.

Because of the nature and number of these culpability factors, as well as the almost limitless variety of possible combinations, there is no workable formula for assigning values to each individual factor. Rather than assign a numeric score to each individual culpability factor, the court instead arrives at one of five culpability levels after considering the combined effect of all culpability factors. The weight that each particular culpability factor plays in a given case will vary. In some cases, the defendant's motive will be the factor most indicative of the defendant's culpability. In other cases, extenuating circumstances will play the most prominent role. Also, these various factors will often overlap. A less culpable motive, or a less culpable nature of the offense, will sometimes be evident in the extenuating circumstances that prompted the defendant to commit the offense.

The end result of the court's analysis should be a culpability level that "ranks" the defendant in the hierarchy of five levels of culpability for all defendants sentenced under this guideline. By definition, all defendants sentenced under the guideline are to some degree "culpable." The court should not be reluctant to find a mitigating culpability value out of concern that it will signal a lack of opprobrium for the offense – the point of the analysis is to accomplish proportionality by meting out sentences that are sufficient but not greater than necessary to accomplish the purposes of sentencing in the light of each defendant's culpability when compared with all

1

other defendants sentenced under this guideline.

As a way of assisting the court in making the culpability assessment, it is anticipated that the middle culpability category – "moderate culpability" – would account for the largest number of defendants sentenced under the guideline. A defendant seeking an assessment of "low" or "lowest" culpability bears the burden of proof to establish this, while the government bears the burden to prove either "high" or "highest" culpability.

In assigning a culpability level, the court should be careful not to "double count" the amount of loss or the victim impact, each of which is a separate specific offense characteristic. Although in some circumstances there may be overlapping considerations bearing on each factor, loss, culpability, and victim impact are each intellectually distinct concepts warranting individualized assessment. Thus, a high loss or significant victim impact may result from conduct reflecting mitigated culpability by some or even all of the criminally responsible participants. Conversely some cases may present aggravated culpability resulting in more limited loss or victim impact.

There is also overlap between the considerations that inform the defendant's level of culpability and those that bear on the defendant's role in the offense as determined under Chapter Three. Nevertheless, as with the relationship of culpability to loss and victim impact, role in the offense is also intellectually distinct from culpability and requires separate inquiry. Where it is necessary for the court to weigh the same considerations governing role in the offense in its assessment of culpability, this may in some circumstances require a sentence outside the range resulting from a cumulative application of the culpability and role adjustments.

The court should also recognize that this guideline is intended to address *offense* characteristics. The court should continue to consider *offender* characteristics at sentencing in accordance with 18 U.S.C. § 3553(a). Although aspects of offender characteristics may overlap with culpability considerations, these are intellectually distinct concepts requiring separate consideration.

(A)     *Motive/Nature of Offense*

One factor in the culpability level is the defendant's motive or the nature of the offense. The following examples occur frequently in cases sentenced under this guideline.

(1)     *Predatory* – These offenses are intended to inflict loss for the sole or dominant purpose of generating personal gain to the defendant or to others involved in the criminal undertaking. These offenses – accompanied by no legitimate purpose – are among the most culpable types of offenses sentenced under this guideline.

2

(2)    *Legitimate ab initio* – These offenses often arise from otherwise legitimate efforts that have crossed over into criminality as a result of unexpected difficulties. Even though such offenses may be intended to cause loss for the purpose of generating personal gain to the defendant or to others involved in the criminal undertaking, they rank lower on the culpability scale than predatory offenses.

(3)    *Risk shifting* – These offenses are not specifically intended to cause loss. Instead, they shift the risk of any potential loss from the defendant (or from others involved in the criminal undertaking) to a third party, such as the victim of the offense. Examples include false statements for the purpose of obtaining a bank loan that is intended to be repaid. Such offenses are generally less culpable than those where loss is specifically intended.

(4)    *Gatekeeping* – These offenses are not specifically intended to cause loss or even to shift the risk of loss. Instead, they violate so-called "gatekeeping" requirements intended generally to prevent practices that create potential loss or a risk of loss. Examples include billing Medicare for medically necessary goods and services that are actually provided without the appropriate third-party verification of medical necessity. Such offenses are generally at the lower level of culpability under this factor.

There may be cases where the nature of the offense fits more than one of these descriptions. And there may be cases for which none of these categories is appropriate. Whether or not these descriptions fit a particular case, the court should take them into account when considering how the defendant's motive (including the nature of the offense) compares, for culpability purposes, to that of other defendants sentenced under this guideline whose offenses match these descriptions.

(B)    *Gain*

Another culpability factor is the gain to the defendant or to others involved in the criminal undertaking.

(1)    *Commensurate with loss* – Where the defendant and others involved in the criminal undertaking derive a gain from the offense in an amount that is roughly commensurate with the loss, this ordinarily indicates a higher degree of culpability.

3

(2)    *Less than loss* – Where the defendant and others involved in the criminal undertaking derive a gain from the offense in an amount that is less than the loss, this ordinarily indicates a lesser degree of culpability than (1).

(3)    *Minimal or Zero* – Where the defendant and others involved in the criminal undertaking derive little or no gain from the offense, this ordinarily indicates a lesser degree of culpability than (2).

The extent to which the defendant *personally* gained may also be relevant to the culpability level.  For example, an accountant convicted for participation in a securities fraud scheme would be less culpable (on the factor of gain) than an officer of the company who personally gained more than the accountant.  Also, a small amount of gain in relation to the loss may not always mean a lower level of culpability.  For example, a defendant who intentionally inflicts a large loss on others for the purpose of achieving a small gain would be more culpable with respect to the gain factor than someone who did not intend the loss.  The degree of culpability in this example varies depending on the extent to which the loss was foreseeable to the defendant.

(C)    *Degree of sophistication/organization*

Criminal undertakings involving a high degree of sophistication and/or organization generally reflect a greater threat of harm and a higher level of culpability. The reverse is also true – where the offense is executed in a simple manner without the involvement of large numbers of participants, this generally reflects a lesser threat of harm and a lower level of culpability.  The court should also consider the extent of the defendant's contribution to the offense's sophistication or organization.  A defendant with less responsibility for the offense's sophistication or organization would be less culpable, all other things being equal, than one with greater responsibility for these characteristics.

(D)    *Duration*

As with sophistication and organization, the duration of the offense and the defendant's participation in it also frequently reflects differences in culpability. Criminal undertakings that extend over several months or longer suggest a greater degree of culpability, while those that occur in a single event or over a shorter period of time in many circumstances reflect a lower level of culpability.

4

(E)     *Extenuating circumstances*

Some defendants will commit an offense in response to various circumstances, such as coercion or duress. There are many extenuating circumstances that could contribute to the commission of an offense, and the extent of their contribution will also vary from case to case. A defendant's culpability will be affected by the nature of these extenuating circumstances and the extent to which they played a part in the commission of the offense.

(F)     *Efforts to mitigate harm, including voluntary cessation, self-reporting, or restitution*

A defendant will sometimes take steps that help mitigate the harm or otherwise reflect a lower level of culpability. Where the defendant voluntarily ceases the offense conduct prior to its detection, this generally indicates a decreased level of culpability. Self-reporting of the offense is also a sign of lower culpability, as is voluntary restitution. In considering the significance of restitution, care must be taken not to punish a defendant more severely as a result of a lack of financial resources.

The court may consider a defendant's cessation of criminal conduct even if it does not qualify as a legal defense to conviction for conduct that occurred after the defendant's involvement ceased. For example, the court may consider the fact that a defendant ceased taking part in a conspiracy even though the legal standard for withdrawing from the conspiracy was not met.

3.     *Victim Impact*:

The guideline has four levels of victim impact: (1) minimal or none; (2) low; (3) moderate; and (4) high. As with the culpability levels, there are many factors to consider in arriving at the appropriate level of victim impact. The court should consider how the combination of these factors places the defendant's offense in comparison to victim impact in other cases under this guideline. The court should also be cognizant that the amount of the victim(s)' loss is already accounted for and should not be counted again in the context of victim impact. An additional score for victim impact is appropriate only where there is a harm beyond that inherent in the amount of the loss.

(A)     *Vulnerability of victims*

Where victims are identified and targeted because some particular vulnerability they suffer, this may indicate a higher degree of victim impact (and/or culpability). The court should be careful not to "double count" the vulnerability of the victims in assessing culpability, victim impact, and the special adjustment in Chapter Three for vulnerable victims, 3A1.1(b). Nevertheless, there may be some circumstances in

5

which the vulnerability of victims results in a peculiar degree of impact, particularly where that impact was foreseeable to the defendant, that would warrant an increase in the victim impact adjustment as well as an enhancement for vulnerable victim in Chapter Three.

(B)     *Significance of loss*

Where the victim suffers losses that threaten the victim's financial soundness, this generally indicates a higher degree of victim impact. This may be more common where the victims are individual as opposed to institutional. It is assumed that in most offenses involving an institutional victim, the impact is measured principally by the amount of the loss such that no additional victim impact adjustment would ordinarily be appropriate in the absence of the failure or bankruptcy of the institution.

(C)     *Other non-economic harm*

Where the victim has suffered a significant non-economic harm, this may not be captured in the loss adjustment, and thus the guideline may understate the seriousness of the offense under some circumstances in the absence of an upward adjustment reflecting victim impact.

(D)     *Victim inducement of offense*

In some circumstances the victim has contributed to the offense in some manner. This may include inducing the commission of the offense or some lesser degree of conduct. Under such circumstances it may be appropriate to partially discount the impact on the victim as a measure of offense severity.

4.     *Offense level cap for offenses that are not "otherwise serious"*:

The Sentencing Reform Act provides as follows: "The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense…." 28 U.S.C. § 994(j). Many of the offenses falling within this guideline are not "otherwise serious."

In determining whether an offense is not "otherwise serious," the court should consider (1) the offense as a whole, and (2) the defendant's individual contribution to the offense. For example, a low level employee who is peripherally involved in what would be an "otherwise serious" offense as to other defendants may nevertheless qualify for this offense level cap.

Factors to be considered in determining whether the offense is one for which a sentence of probation is appropriate include the following: the amount of the loss; whether loss was intended at the outset of the offense conduct; whether the defendant's gain from the offense is less than the loss; whether the defendant's

offense conduct lacked sophistication (including whether it was committed in a routine manner or without the involvement of a large number of participants); whether the defendant acted under duress or coercion; the duration of the offense conduct and the defendant's participation in it; whether the defendant voluntarily ceased the offense conduct before it was detected; and the nature of the victim impact caused by the offense. Where the defendant has no criminal history points, and where the circumstances of the offense support a finding that the offense was not "otherwise serious," the offense level under this guideline shall be no greater than 10, and a sentence other than imprisonment is generally appropriate.

**Reporter's Notes**

**A.      Members of the Task Force and Principles of Consensus.**

In April 2013 the Criminal Justice Section of the American Bar Association assembled this Task Force to evaluate the reforms needed in the sentencing of federal economic crimes and to draft a proposed federal sentencing guideline to effectuate those reforms.  The Task Force consists of five professors, three judges, six practitioners, two organizational representatives, and observers from the Department of Justice and the Federal Defenders:

- Stephen Saltzburg (Chair)
  Professor of Law, George Washington
  University School of Law

- James E. Felman, Esquire (Reporter)
  Kynes, Markman & Felman, P.A.

- Sara Sun Beale
  Professor of Law
  Duke University School of Law

- Barry Boss, Esquire
  Cozen O'Connor

- David Debold, Esquire
  Gibson Dunn & Crutcher

- The Honorable Nancy Gertner
  Professor of Law
  Harvard Law School

- The Honorable John Gleeson
  United States District Court
  Eastern District of New York

- A. J. Kramer (Observer)
  Federal Defender
  District of Columbia

- Gary Lincenberg, Esquire
  Bird, Marella, Boxor, Wolpert,
  Nessim, Brooks & Lincenberg

- The Honorable Gerard Lynch
  United States Court of Appeals

for the Second Circuit

- Jane Anne Murray
  Practitioner in Residence
  University of Minnesota Law School

- Kyle O'Dowd, Esquire
  Associate Executive Director for Policy
  National Association of Criminal
  Defense Lawyers

- Marjorie J. Peerce, Esquire
  Ballard, Spahr, Stillman
  & Friedman, P.C.

- Mary Price, Esquire
  Vice President and General Counsel
  Families Against Mandatory Minimums

- The Honorable Jed Rakoff
  United States District Court
  Southern District of New York

- Neal Sonnett, Esquire
  Neal R. Sonnett, P.A.

- Kate Stith
  Professor of Law
  Yale Law School

- The Honorable Jonathan Wroblewski
  (Observer)
  Director, Office of Policy and
  Legislation
  United States Department of Justice

After a number of meetings and telephone conferences, the group arrived at a consensus proposal subject to a number of important caveats. These caveats are an essential aspect of the proposal to avoid misunderstanding its nature and scope.

First, we feel more strongly about the structure of the proposal than we do about the specific offense levels we have assigned. We assigned offense levels in the draft because we think it is helpful in understanding the structure, but the levels have been placed in brackets to indicate their tentative nature. Indeed, in some instances we have bracketed a range of levels, although as noted below in the discussion of the "Twenty-Five Percent Rule" we recognize that a final guideline likely could not include such a range. We have performed no research and have no empirical basis for the levels we assigned in the draft.

We have applied the proposal to an array of specific case scenarios, and this exercise was very helpful to us on a number of levels. We were reassured about the structure of the proposal – we felt the proposal captured the offense characteristics most relevant to sentencing, and it placed appropriate weight on the considerations of loss, culpability, and victim impact in relation to one another. We also felt that the proposal is sufficiently clear and specific that it leads to reasonably uniform application. Although the culpability and victim impact considerations do not lend themselves to exact quantification in the same way as measuring the amount of loss, we were able to reach consensus on the application of the proposal to the scenarios without undue difficulty or disparity. Most us were comfortable with the range of outcomes that result from the levels assigned in the draft, but it should be understood that we devoted the bulk of our efforts to structural improvements and less time to issues of optimal punishment severity, in part out of a recognition that there are inherently political components to such judgments.

Second, we discussed but did not fully resolve the question of whether certain categories or types of offenses should be sentenced under a separate guideline in light of the very wide array of offenses sentenced under this guideline. We believe, in particular, that certain types of securities offenses where changes in the value of market capitalization drive the loss calculation may be especially suited for consideration under a separate guideline.

Third, the proposal is submitted as a consensus product in accordance with the following limiting principles:

1.  It is assumed that, for the foreseeable future, the current structural framework dictated by statute will remain in place, including the 25% rule (28 U.S.C. § 994(b)(2)), and that the Commission therefore will still find it necessary to assign fairly specific numeric values to sentencing considerations. The draft proposal is written to comply with that assumed structural framework, although it should be noted that the American Bar Association supports the repeal of the 25% rule. ABA Justice Kennedy Commission, Reports with Recommendations to the ABA House of Delegates (August 2004), http://www.abanet.org/crimjust/kennedy/Justice KennedyCommission ReportsFinal.pdf).

2.  This structural framework (both the 25% rule and the guidelines' overly arithmetic approach) is not ideal because it can be unduly rigid and lead to the arbitrary

assignment of values and the overemphasis of considerations that are more easily quantified to the detriment of equally relevant considerations that are less easily quantified. There is also a risk under the current structural framework that a guideline will appear to carry more empirical or scientific basis than is present.

3.  A better structural framework would (a) place less emphasis on arithmetic calculations and those few sentencing considerations that lend themselves to exact quantification; and (b) allocate greater sentencing authority to the judiciary.

4.  The Task Force is not necessarily of one mind regarding the ideal allocation of sentencing authority between the Congress, the Sentencing Commission, the Judiciary, and the Executive Branch, but it was not deemed necessary to achieve consensus on this point as this proposal is premised on the assumption that the current structural framework will remain in place.

**B.  Intent of the Proposal Within the Existing Guidelines Structure**

The proposal is intended as a free-standing substitution in the Guidelines Manual for the existing Guideline Section 2B1.1. There are two aspects of this substitution that bear particular emphasis.

First, we understand that Subsection (c) of the proposed guideline regarding Specific Offense Characteristics ("SOCs") would need to be tailored to comply with specific Congressional directives to the Sentencing Commission. Many of these directives are open-ended, and require only that the Commission "consider" amending the guidelines as necessary in light of specific legislation. We believe our proposal accommodates those directives by instructing the court to apply the SOCs in the existing guideline that resulted from such directives where the offense presents a special concern of the kind intended to be addressed by these SOCs, and where that concern has not otherwise been addressed in determining the offense level under the guideline. But we also recognize that there have been a handful of Congressional directives that required specific amendments to the guideline. An example of such a specific directive is that contained in the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 10606, 124 Stat. 119, 1006 (2010), which directed new offense level increases for higher loss frauds involving government health care programs. Our proposal would need to be conformed to these specific directives if adopted by the Sentencing Commission.

Second, the proposal, like all provisions of Chapter Two of the Guidelines, is intended to deal solely with *offense* characteristics. The court should continue to consider *offender* characteristics at sentencing in accordance with 18 U.S.C. § 3553(a). Although aspects of offender characteristics may overlap with culpability considerations, these are intellectually distinct concepts requiring separate consideration.

**C.    Compliance with the "Twenty-Five Percent" Rule**

Title 28 U.S.C. § 994(b)(2) provides: "If a sentence specified by the guidelines includes a term of imprisonment, the maximum of the range established for such a term shall not exceed the minimum of that range by more than the greater of 25 percent or 6 months, except that, if the minimum term of the range is 30 years or more, the maximum may be life imprisonment." Early in the life of the Sentencing Commission, it decided to construe this statutory limitation to apply not only to the final sentencing range resulting from the guidelines computation, but also to each adjustment along the route of that computation. While this construction of the statute does not appear to be compelled by its terms, our proposal is drafted on the assumption that the Commission will not revisit this question. Accordingly, we recognize that adoption of our proposal would require the Commission to select a specific numeric value for the base offense level and each of the culpability categories. As noted above, we elected to include a range of possible values in our proposal to illustrate the range of possible outcomes under it, depending on the levels ultimately selected by the Commission. We are confident, however, that if a specific value is inserted for the base offense level and each of the culpability levels, our proposal would then comply with the statute. We have heard some outside comment that because the culpability consideration groups together a wide array of factors and thus results in such a wide array of ultimate offense level outcomes, this renders the proposal violative of the statute. We do not agree with this view, and find support for our position in the observation that role in the offense also groups together a wide array of potential considerations and can result in an eight-level swing in the range resulting from those considerations. *See* U.S.S.G. §§ 3B1.1, 1.2.

**D.    Case Scenarios**

These scenarios are intended to illustrate application of the proposal and the manner in which it might diverge from the current guideline. They are intended as a rough illustration of how the proposal would operate based on a very general level of detail. A much wider array of facts would frequently be relevant to a court's consideration of an appropriate sentence. Also, the scenarios do not include information regarding the history or characteristics of the offender under the assumption that these very important sentencing factors will be considered by the court in fashioning a reasonable sentence pursuant to 18 U.S.C. § 3553(a). Finally, the scoring of the scenarios continues to utilize a range of offense levels for the base and culpability factors, but we recognize that adoption of the proposal would require the selection of a specific numeric value for these factors in accordance with the "twenty-five percent" rule in 28 U.S.C. § 994(b)(2).

## Case Scenario 1

The defendant was an organizer and leader of a fraudulent "lottery" scheme in which elderly persons were identified and contacted by telephone, advised that they had won a lottery award, and told that to obtain the award they must first pay advance fees to cover matters such as taxes, insurance, bonding, or other matters. After the victims submitted the requested fees, they were advised to expect the delivery of their winnings via armored car to their homes at specific dates and times. When the armored car did not arrive, the victims' efforts to contact those to whom they had remitted the fees were not successful. The scheme victimized 14 individuals, most of whom were 70 years old or older. For six of the victims, the losses represented their life savings. The fees paid ranged from $20,000 to $175,000, with a total loss to all victims of roughly $1.7 million. The majority of these funds were obtained by the defendant and converted to his personal use.

Score under current guideline:

| | |
|---|---|
| Base Offense level: | 7 |
| Loss: | +16 |
| more than 10 victims/mass marketing: | +2 |
| Vulnerable victim | +2 |
| Role in the offense | +4 |
| | 31 |

Score under ABA proposal:

| | |
|---|---|
| Base Offense level: | 6-8 |
| Loss: | +8 |
| Highest culpability: | +6-10 |
| High victim impact: | +6 |
| Vulnerable victim | +2 |
| Role in the offense | +4 |
| | 32-38 |

This scenario presents a predatory offense where the defendant's gain was roughly commensurate with the loss. Although the scenario does not specify the degree of sophistication or duration of the offense, some sophistication and duration is implicit in the nature and extent of the scheme. No extenuating circumstances or efforts to mitigate harm are specified. This presents a "highest culpability" offense. The victim impact is also "high" in light of the significance of the loss to six of the victims. The scheme targeted the victims based on their elderly status, and if some of them were unusually vulnerable for that reason this would be additional support for findings of high victim impact and highest culpability. It is assumed that for purposes of Chapter Three this scenario would also score adjustments for both vulnerable victim and leadership role in the offense. These adjustments are the same under both this proposal and the existing guideline as this proposal does not address Chapter Three.

12

**Case Scenario 2**

The defendant was the owner of a legitimate business for many years and financed the operations of the business through a line of credit secured by the inventory and accounts receivable of the business. When the business came on difficult times, the defendant caused the submission of false information to the lender regarding both inventory and accounts receivable, thus enabling the business to borrow more than it would otherwise have been permitted to borrow. The defendant also attempted to support the operations of the business by liquidating his personal assets and investing the proceeds into the business. The lender discovered the fraud and caused the termination of the business. After mitigating its losses by selling the inventory and collecting legitimate accounts receivable, the lender was left with a loss of approximately $6.9 million. A forensic accounting revealed that during the period of the fraud the defendant contributed more funds to the business than he withdrew from it in salary and other compensation.

Score under current guideline:

| | |
|---|---|
| Base Offense level: | 7 |
| Loss: | +18 |
| More than $1 Million in gross receipts: | +2 |
| Role in the offense | +4 |
| | 31 |

Score under ABA proposal:

| | |
|---|---|
| Base Offense level: | 6-8 |
| Loss: | +10 |
| Low culpability: | -3-5 |
| Low victim impact | +2 |
| Role in the offense | +4 |
| | 17-21 |

This scenario presents a mixture of legitimate ab initio and risk shifting fraud. Although the offense had some degree of sophistication, the less culpable motive, zero gain to the defendant, extenuating circumstances, and efforts to mitigate harm result in a "low culpability" score. The victim impact is also rated as "low" given that it involved a single institutional victim, but not minimal given the magnitude of the loss and the difficulty of the detection of the offense and the efforts needed to mitigate its harm. It is assumed the defendant would receive a leadership role in the offense adjustment under Chapter Three.

13

## Case Scenario 3

The defendant was the owner of a durable medical equipment business that provided oxygen to Medicare patients.  To qualify for reimbursement, equipment providers must ensure the oxygen is medically necessary by sending patients to an independent laboratory for testing.  Instead of referring patients to independent labs for testing, the defendant caused his employees to conduct the testing themselves and then falsely represent to Medicare that the testing had been performed by an independent lab.  Virtually all of the oxygen was medically necessary, although Medicare would not have paid the bills for it had the failure to qualify the patients by independent testing been disclosed.  The fraud continued for more than a year, and involved in false representations regarding the testing of 159 patients.  The amount billed to Medicare for their oxygen was $7.1 million.  The patients were billed a small co-pay fee, and a small portion of the reimbursement for the oxygen received by these patients was also paid by 109 supplemental insurance companies.

Score under current guideline:

| | |
|---|---|
| Base Offense level: | 7 |
| Intended loss: | +20 |
| Sophisticated means: | +2 |
| Production of unauthorized access device: | +2 |
| More than 250 victims: | +6 |
| Health care fraud offense | +3 |
| Role in the offense | +4 |
| | 44 |

Score under ABA proposal:

| | |
|---|---|
| Base offense level: | 6-8 |
| Actual loss: | +10 |
| Moderate culpability: | 0 |
| Low victim impact: | +2 |
| Health care fraud offense | +3 |
| Role in the offense | +4 |
| | 25-27 |

This scenario presents a gatekeeping offense (although if the oxygen was either not provided or medically unnecessary this would be a predatory offense).  Under current law in at least some circuits, the amount billed is treated as loss notwithstanding the medical necessity of the oxygen.  *See*, *e.g.*, *United States v. Bane*, 720 F.3d 818 (11th Cir. 2013).  Notwithstanding the less culpable motive, the defendant's culpability is considered "moderate" given his personal benefit as the owner of the company, the degree of sophistication involved, the duration of the offense, and the absence of any extenuating circumstances or efforts to mitigate harm.  The victim impact is considered low in light of the medical necessity of the treatments provided but not minimal in light of the sensitive nature of the government benefits program at issue.  It is assumed that an additional three-level upward adjustment would be required under the Congressional directive presently located at 2B1.1(b)(7), as well as a leadership enhancement under Chapter Three.

14

**Case Scenario 4**

The defendant accepted $1,000 to act as a "straw purchaser" in a fraudulent real estate transaction that resulted in a $250,000 loss to a financial institution.

Score under current guideline:

| | |
|---|---|
| Base offense level: | 7 |
| Loss: | +12 |
| Role in the offense | <u>-2</u> |
| | 17 |

Score under ABA proposal:

| | |
|---|---|
| Base offense level: | 6-8 |
| Loss: | +6 |
| Low culpability: | -3-5 |
| Minimal victim impact: | 0 |
| Role in the offense | <u>-2</u> |
| | 5-9[1] |

This scenario presents a risk shifting offense in which the defendant's gain is minimal in relation to the loss and the offense involved limited sophistication and duration. On the other hand, the defendant knowingly played an essential role in a serious offense causing a significant risk of loss and did derive a direct personal benefit from the offense. For these reasons, the defendant's culpability would be "low" but not "lowest." The victim impact is considered minimal in that the victim is institutional, the amount of the loss did not threaten the security of the institution, and the severity of the offense conduct is adequately captured by the loss amount alone. A mitigating role in the offense adjustment under Chapter Three is assumed, but would not in all cases be applied.

---

[1]If the Base Offense Level is set at 8, Low Culpability is set at -3, and the defendant did not receive a mitigating role adjustment, this would result in an offense level 11, but in this scenario the offense level cap for non-serious offenses would cap the offense level at 10 if the defendant is a first offender.

# EXHIBIT "B"



























# EXHIBIT "C"



**Source of Seized Information**

**PHYSICAL/DIGITAL EVIDENCE AND REPORT DESCRIPTION**































