TIMOTHY COURCHAINE
United States Attorney
District of Arizona
Assistant United States Attorney
Jane L. Westby
Assistant U.S. Attorney
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Email: jane.westby@usdoj.gov

EDWARD P. SULLIVAN
Acting Chief
U.S. Department of Justice
Public Integrity Section
Nicholas W. Cannon
Senior Litigation Counsel
1301 New York Ave., NW
Washington, D.C. 20530
Telephone: 202-514-8187
Email: nicholas.cannon2@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>        vs.<br><br>Elizabeth Gutfahr,<br><br>                    Defendant. | CR-24-08132-TUC-RM (EJM)<br><br>United States Sentencing Memorandum<br><br>Sentencing: June 23, 2025, 2:30 p.m. |

The United States of America, by and through, the undersigned government attorneys, submits the following memorandum setting forth the Government's position at sentencing.

**Introduction**

This is a case about the greed of one person. Defendant Elizabeth Gutfahr's

(defendant) single common goal was to enrich herself at the expense of the United States and the citizens of Santa Cruz County that elected her to serve as their voice. Defendant was originally elected to serve as Santa Cruz County Treasurer in 2012. Only fourteen months after being sworn in as Treasurer, Defendant began to unlawfully wire money from a Santa Cruz County ("the County") account directly to an account that she had opened in 2011 in the name of Rio Rico Real Estate and Consulting. Over the course of the next ten years, defendant embezzled approximately $38.7 million dollars from the County and used this money to live a lavish lifestyle that included the purchase of at least a dozen luxury and/or high-end vehicles, several residential properties, and the extensive remodel of an opulent ranch. Defendant's abuse of the public trust warrants a guideline sentence of 108 months imprisonment, three (3) years of supervised release, and restitution to the County in the amount of $38,712,100.00. This sentence will be a just punishment, promote respect for the law, and deter other public officials from such an egregious abuse of power.

## **Factual Background**

Defendant Gutfahr served as Santa Cruz County Treasurer from 2013 through 2024. The Treasurer's Office is the County's fiscal custodian and is responsible for collecting taxes, distributing county funds, and the management of the County's accounts. This includes management of the County's annual property tax revenue. (PSR, p. 5, ¶ 10.)

Between March 13, 2014, and March 28, 2024, Defendant embezzled approximately $38,712,100.00 of County funds via 187[1] wire transfers to two accounts. The embezzled amounts are represented below:

---

[1] A total of 186 wire transfers were drawn on the County's Chase savings account. Only one (1) wire transfer was drawn on the County's checking account on November 2, 2021, in the amount of $225,000.00. (Exhibit 1, Bates No. 3.000001-5.)

| Year | Number of Wire Transfers | Amount Embezzled |
|---|---|---|
| 2014 | 6 | $386,100.00 |
| 2015 | 12 | $948,000.00 |
| 2016 | 13 | $920,000.00 |
| 2017 | 18 | $1,970,000.00 |
| 2018 | 23 | $2,160,000.00 |
| 2019 | 24 | $3,560,000.00 |
| 2020 | 26 | $4,525,000.00 |
| 2021 | 18 | $4,913,000.00 |
| 2022 | 18 | $5,165,000.00 |
| 2023 | 21 | $11,350,000.00 |
| 2024 | 8 | $2,815,000.00 |
| **Total** | **187** | **$38,712,100.00** |

(Dkt. 12, Plea Agreement, p. 14.)

Defendant used two bank accounts that she opened and controlled to deposit the stolen funds. Using a business account in the name of Rio Rico Real Estate and Consulting ("RRREC"), created by Gutfahr in 2011 as sole proprietor and signer, she wired County funds directly from the County's saving and checking accounts, to the RRREC business account. RRREC was not an operating business and performed no services for the County. In January 2024, Defendant also opened a separate business checking account with a different financial institution in the name Rio Rico Consulting, LLC (RRC). RRC was also not an operating business and performed no services for the County. In January 2024, defendant began to deposit the stolen County Funds into the RRC account. (Dkt. 12, Plea Agreement, p. 13.)

Defendant was able to perform the wire transfers undetected by fraudulently subverting the two-step approval process for wire transfers. Defendant subverted the two-step process by utilizing the token of her subordinate so that she could both initiate and approve the wire transfers. Defendant lied to this subordinate by stating that the bank account receiving the funds was used to earn interest for the County. (Dkt. 12, Plea Agreement, p.14.)

Defendant falsified accounting and investment records to conceal her thefts. From

2018 through 2020, defendant falsified cash reconciliation records by falsely reporting that some payments for County expenses had not been recorded on the County's general ledger, knowing this to be false. From 2021 to 2023, defendant generated false UBS Financial Services statements to fraudulently show that the County had investments in UBS accounts in the amounts of $14,000,000.00, $17,200,000.00, and $26,531,512.60 for each year 2021 through 2023, when the County did not have this money invested. (Dkt. No. 12, Plea Agreement, p 15.)

Defendant used the stolen public funds to renovate a luxurious ranch, and cattle ranch,[2] purchase luxury vehicles for herself and family members, and purchase numerous other properties.

In addition to this embezzlement scheme Defendant concealed the embezzled money from the United States by failing to report any of the embezzled funds as income. In the tax year 2023 alone, Defendant evaded more than $4,000,000.00 in income taxes. (Dkt. 12, Plea Agreement, p. 17.) The total tax defendant owes for the years 2014 through 2023 is $13,143,526.00. (*Id.*, ¶21). Defendant told FBI agents in April 2024 that she did not have time to file her taxes. (Exhibit 2, Interview of Defendant, April 2024, Bates No. 2.000123.)

## Legal Analysis

The Ninth Circuit has set forth a basic framework that district courts should follow in compliance with the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220 (2005):

---

[2] Rancho San Cayetano operated as a luxury ranch and horse boarding operation. Defendant spent approximately $6,000,000.00 in funds to renovate this ranch and other properties with funds derived from the embezzlement scheme. A video that depicts the opulence of this property can be viewed here: https://www.youtube.com/watch?v=uoYhv2z2gFg (Exhibit 10, Bates No. 9.000381; See also Dkt. No. 9, Plea Agreement, p. 15.) The Double D Cattle Company was also maintained with embezzled funds. (PSR, ¶ 36; Exh. 9, video of defendant discussing Double D Ranch renovations, Bates No. 9.000363.)

(1) Courts are to begin all sentencing proceedings by correctly determining the applicable sentencing guidelines range, precisely as they would have before *Booker*.

(2) Courts should then consider the § 3553(a) factors to decide if they support the sentence suggested by the parties. Courts may not presume that the guidelines range is reasonable. Nor should the guidelines factors be given more or less weight than any other. The guidelines are simply to be treated as one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence.

(3) If a court decides that a sentence outside the guidelines is warranted, then it must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.

(4) Courts must explain the selected sentence sufficiently to permit meaningful appellate review.

*United States v. Carty*, 520 F.3d 984, 991–92 (9th Cir. 2008).

## Sentencing Calculations

### A. Maximum Penalties

The maximum penalties for violation of 18 U.S.C. § 666(a)(1)(A) (Count One – Embezzlement of a Public Official), are a term of imprisonment of ten (10) years, a fine up to $250,000.00, and a term of supervised release not to exceed three (3) years. The maximum penalties for violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Count Two – Money Laundering), are a term of imprisonment of twenty (20) years, a fine up to $77,424,200.00 – which is twice the value of the embezzled funds (*see*, PSR, p. 1; Dkt. No. 12, Plea Agreement, p. 3), and a term of supervised release not to exceed three (3) years). Finally, the maximum penalties for a violation of 26 U.S.C. § 7201 (Count Three – Tax Evasion), is a fine up to $100,000.00, a term of imprisonment of five (5) years, or both, and a term of three (3) years supervised release.

### B. Sentencing Guideline Calculations

"As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38,

49 (2007). With the exception of the zero-point offender and substantial financial hardship adjustments, the United States agrees with the calculation of offense level by the United States Probation Office ("USPO"). The United States submits that the defendant's total offense level is 29 as set forth on page 40 of the Presentence Report. (PSR, p. 40). When combined with the defendant's criminal history category (I), the guideline range for the defendant is 87 - 108 months imprisonment.

### C. *Application of the Zero-Point Offender Adjustment*

The recently added section of the Sentencing Guidelines, U.S.S.G. § 4C1.1, provides for a zero-point offender adjustment if a defendant meets certain criteria. In this case, the only questionable condition that would render defendant ineligible for this adjustment would be if "the defendant did not personally cause substantial financial hardship." See *Id.* "In determining whether the defendant's acts or omissions resulted in "substantial financial hardship to a victim, the court shall consider, among other things, the non-exhaustive list of factors provided in Application Note 4(F) of the Commentary to §2B1.1" U.S.S.G. §4C1.1(b)(3).

U.S.S.G. §2B1.1 advises that, "In determining whether the offense resulted in substantial financial hardship to a victim, the court shall consider, among other factors, whether the offense resulted in the victim-- (i) becoming insolvent; (ii) filing for bankruptcy under the Bankruptcy Code (title 11, United States Code); (iii) suffering substantial loss of a retirement, education, or other savings or investment fund; (iv) making substantial changes to his or her employment, such as postponing his or her retirement plans; (v) making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and (vi) suffering substantial harm to his or her ability to obtain credit." Application Note 4(F) of the Commentary to §2B1.1.

The United States must first meet the definition of "victim" for the substantial financial hardship enhancement to be considered. There is support that a government agency or entity may be considered a "victim" for purposes of applying the enhancement under §2B1.1 for substantial financial hardship. U.S.S.G. §2B1.1(b)(2(A)(iii). In *United*

*States v. Herrera*, a state agency was properly considered a victim for the number of victims enhancement in the same subsection under U.S.S.G. §2B1.1(b)(2)(A). *See United States v. Herrera*, 974 F.3d 1040 (9th Cir. 2020) (holding on plain error review that "state governments who suffer losses that are included in the actual loss calculation under §2B1.1(b)(1) are properly counted as victims for purpose of the number-of-victims enhancement in §2B1.1(b)(2)(a)(i)"). The court in *Herrera* did not consider the "substantial financial loss" provision as it relates to government entities.

The Crime Victims' Rights Act ("CVRA") defines the term "crime victim" as a person directly or proximately harmed as a result of the commission of a Federal offense…" *See* 18 U.S.C. §3771(e)(2)(A). While the CVRA, does not further define person, the scope of that term is defined by the Dictionary Act, which provides that a person includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies." 1 U.S.C. § 1; *see also* U.S.S.G. § 2B1.1, Application Note 1 (using same definition). Accordingly, while most entities will be considered victims under the CVRA, the federal government or any state, local, tribal, or foreign government or agency thereof will not be.[3]

In this case, whether or not the County may be defined as a victim under § 2B1.1 is not dispositive, because the factors under § 2B1.1 preclude a finding of substantial financial hardship. While the government understands the impact that the embezzlement has had on the public trust and community, the factors listed in §2 B1.1 are not met because the actual impact remains unknown.  The method that will be used to account for the loss has not been decided.  For example, the entities may absorb the loss or taxes may be increased to absorb the loss.

Thus, in the absence of an enhancement for substantial financial hardship, defendant, qualifies for an additional two-level reduction for zero-point offender. U.S.S.G. § 4C1.1.

---

[3] In contrast to the CVRA, the government is included in the definition of "victim" under the Mandatory Victim Restitution Act ("MVRA"). 18 U.S.C. § 3664(h).

### Imposition of Sentence Under 18 U.S.C. § 3553

***A. Application of the Guidelines in Imposing a Sentence under 18 U.S.C. §3553(b.)***

The Supreme Court has advised that "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007). And while those guidelines serve as one factor among several that courts must consider in determining an appropriate sentence, it remains that "the Commission fills an important institutional role: It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough v. United States*, 552 U.S. 85, 90, 108-09 (2007) (internal quotation marks omitted). Thus, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Id.* (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)).

The guidelines are the sole means available for assuring some measure of uniformity in sentencing, thereby fulfilling a key congressional goal in adopting the Sentencing Reform Act of 1984. Reference to the guidelines, while carefully considering the § 3553(a) factors, is the only available means of preventing the disfavored result of basing sentences on the luck of the draw in judicial assignments. The guidelines, therefore, deserve significant respect. The Government recognizes that the guidelines are entirely advisory, and that a district court has discretion to vary from an advisory range, subject only to deferential appellate review for reasonableness. A district court, however, must consider the guidelines range, *see* § 3553(a)(4), and is usually well-advised to follow the Sentencing Commission's advice to assure fair, proportionate, and uniform sentencing of criminal offenders. Moreover, there are no other § 3553(a) factors in this case that mitigate against imposition of a sentence within that range; to the contrary, as discussed below the § 3553(a) factors on balance support the imposition of the recommended guidelines sentence.

***B. 18 U.S.C. §3553(a) Factors***

In sentencing the defendant, some of the factors this court must consider are the

need for the sentence to: (1) consider the nature and circumstances of the offense and the history and characteristics of the defendant, 2) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (3) avoid unwanted sentencing disparities, and (4) provide restitution to any victims of the offense. See 18 U.S.C. § 3553(a).

    1. <u>The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant</u>

The offenses of conviction exemplify a pattern of behavior that exhibits the defendant's dishonesty, disregard for the law, and willingness to turn her back on the community that elected her – all for her personal gain. The defendant indiscriminately stole public funds, took efforts to conceal these crimes, and meanwhile lived a lavish lifestyle. The defendant's embezzlement of funds from the County treasury is a serious offense that undermines the central tenets of public service. Moreover, the money stolen could have certainly been used to help improve the lives of a rural county that relies on a modest tax base to funds schools, fire districts, and other basic services that are relied upon.

Defendant's thefts continued for a decade. Defendant stole money repeatedly through 187 wire transfers from the County's bank accounts to support her lavish lifestyle. As the years passed, defendant was stealing so much money that she needed to fabricate false UBS investment account statements showing millions of dollars in false balances to conceal her thefts. (Dkt. No. 12, Plea Agreement, pp. 14-15.) Before this, defendant altered accounting reports to hide her thefts. (*Id.*) In one year alone, she stole over $11,000,000.00 with one withdrawal exceeding $2.9 million. (PSR, ¶17.) Defendant did not stop until she was caught.

Defendant used the millions of dollars that she stole to purchase houses, ranches, and land. (PSR, ¶ 37; Tracing disclosed at Bates No. 3.000019 to 3.000039.) Defendant then used $6.4 million more of stolen money to renovate these properties. (PSR ¶ 37.) Defendant spared no expense when it came to spending the County's funds for her own

1 desires.



(Bates No. 9.000002.)

Defendant also purchased several high value vehicles with the stolen funds, including a 2015 Mercedes Benz G550, 2016 Cadillac Escalade, 2017 Ford F350 4WD, 2017 Land Rover Discovery, 2017 Yamaha 686, 2018 Airstream Touring Coach, 2019 Entegra Coach Aspire, 2020 Jeep Gladiator Rubicon, 2021 Cadillac Escalade Sport 4WD, 2021 Ford Expedition King Ranch 4WD, 2022 Honda Pioneer 1000 SxS Deluxe, and a 2023 Jeep Grand Wagoneer.  (PSR, ¶37; Tracing disclosed at Bates No. 3.000040-3.000060.)

After the purchase of the 2019 Entegra Coach (estimated MSRP of $470,000.00), defendant left it to the rodents, and it fell into disrepair.  (PSR, ¶ 39.)  In fact, the Receiver appointed to evaluate and sell assets, noted the overall declining state of the entire Gutfahr estate.[4]  (PSR, ¶ 39.)  Clearly, the defendant had no concern for the value of many of the

---

[4] A Receiver was appointed in the Pima County Superior Court case of Santa Cruz County v. Elizabeth Gutfahr, et. al. C20244535.  Funds collected are to be credited toward

assets because they had come at no cost of her own.

Defendant had multiple American Express credit cards. Between 2014 and 2024, defendant, her husband, and two relatives charged approximately $4,866,480.00 on the American Express cards, and the charges were almost entirely paid for by County funds. (Dkt. No. 27-3, Fourth Interim Receiver's Report.) A significant number of American Express charges were for luxury clothing, shoes, accessories, jewelry and handbags.[5] (*Id.*)

Defendant had opportunity in her life, but instead she chose to steal. Defendant is an educated woman with self-proclaimed decades of business experience, including, land development, accounting, customer service, real estate taxes and property management. (Exh. 3, Hank Stephenson, *Liz Gutfahr says office needs new leadership,"* Nogales International, August 14, 2012, https://www.nogalesinternational.com/news/liz-gutfahr-says-office-needs-new-leadership/article_f69ca2b0-e622-11e1-892c-001a4bcf887a.html ) With this experience, the defendant was entrusted by the people of Santa Cruz County to be their fiscal guardian. Instead, she chose to steal and lie about it to her constituents, other government agencies, and even the FBI.

After she was caught stealing, defendant was misleading and untruthful when she spoke with the FBI in April 2024. After the bank reported recent suspicious transactions to the County, County representatives confronted Gutfahr. (Exh. 2, Interview of the Defendant, April 8, 2024, Bates No. 2.000003-4.) When defendant was later interviewed by the FBI, she admitted to stealing only the recent amount that the County was told about.

Defendant told the FBI Agents that she may be suspended by the County for transfers that she made to an account from September 2023 through October 2024, an account she recently opened. (Exh. 2, Bates No. 2.000004-5.) Defendant then lied when she told the agents that she opened the account because some companies need a "middleman" if you are going to invest with them. (Exh. 2, Bates No. 2.000004-5.) Later

---

the balance of restitution owed in this case.

[5] Adding in American Express payments to defendant's American Express business credit cards, the payments made for both personal and business credit cards totaled approximately $7.3 million. (PSR, ¶37, Bates No. 3.000011.)

on, defendant forgot about her "middleman" story and said that she opened the account to do business for her cattle business and horse boarding. (Exh. 2, Bates No. 2.000056-2.000057.) Defendant then turned back to her story that the account was opened for the County. (Exh. 2, Bates No. 2.000057-58.)

Without telling the agents about the millions that she wired into the first account, defendant told the agents that the amount she wired to the recently opened account was "a little over $1.5 million." [6] (Exh. 2, Bates No. 2.000062.) Defendant said the only time she was transferring funds from the County was "the last three months," and then later stated again that it was since September [2023]. (Exh. 2, Bates No. 2.000082-84.)

Defendant made $65,000 at the County. (Exh. 2, Bates No. 2.000102.) When asked how she could afford to purchase properties in the amount of about $2.8 million, she said it was because of the horse boarding business and the cattle business. (Exh. 2, Bates No. 2.000179-181.) Later, defendant said business was hard and that is why "this happened." (Exh. 2, Bates No. 2.000181.) Defendant had a $24,000.00 monthly mortgage payment on her ranch and may have used some County money to pay for it because County money "might have gotten mixed in there." (Exh. 2, Bates No. 2.000149-150.)

2. <u>The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, and Afford Adequate Deterrence to Criminal Conduct.</u>

A sentence of 108- months imprisonment, concurrent for all counts, is necessary to reflect the seriousness of defendant's crimes and provide just punishment. Defendant has violated the public trust in an unprecedented way, and it may take Santa Cruz County years to recover.

It is the residents of Santa Cruz County that have and will continue to suffer because of defendant's greed. The following examples are from the interviews and impact

---

[6] The account that defendant opened during this time period in about January 2024 was the Rio Rico Consulting account ending in 6896, which defendant used to deposit approximately $1.8 million in stolen County funds. (Exh. 1).

statements of representatives of school and fire districts from Santa Cruz County that may need to absorb potentially large shares of the loss.[7] Although the economic effect of the embezzlement is not yet known, the following examples demonstrate the demographics of the County and the chaos and anxiety that defendant has caused.

The Santa Cruz Valley Unified School District No. 35 (District No. 35) faces considerable economic challenges. It has a poverty rate of 20%, a median household income of $51,885, and an unemployment rate higher than the state average. (Dkt. No. 27-3, Impact Statement, Santa Cruz Valley Unified School District No. 35, Bates No. 9.000050.) District 35's allocation of the loss is reported to be over $14 million. (*Id.*) Even with its share of restitution through asset recovery by the Receiver, estimated at about $4.3 million, District 35 may still have a loss of approximately $10 million. (*Id.*)

At the same time, District 35 is in critical need of building weatherization and drainage repairs because it experiences severe flooding in the monsoon season. (Dkt. No. 27-3, Bates No. 9.000050.) The estimated cost to address these urgent repairs is $3.2 million. (*Id.*) In the future, District 35 will need to restate financial statements and the District's credit rating may be significantly impacted. (*Id.*)

It is also difficult to quantify the loss of District 35's ability to reach out to the community and ask for approval to increase taxes for capital expenses or operating funds. (Exh. 4, Interview of CFO and counsel for Santa Cruz Valley Unified School District No. 35, Bates No. 9.000420-9.000421.) The ability to rebuild public trust is unknown. (Exh. 4, Bates Nos., 9.000420.) The cost of future bonds is also an unknown. (Exh. 4, Bates No. 9.000421.) Additionally, the only recourse for the district to recoup any funds not reimbursed by the County (estimated at $10 million) would be to assess taxes against a community which is not affluent and cannot easily afford a tax increase. (Exh. 4, Bates No.9.000427.)

---

[7] Each of the entities, such as the school and fire districts, that had funds maintained by the County, have a potential loss allocated based on the amount of funds the County maintained for the entity.

1  Similar to District 35, the Nogales United School District (Nogales District) has a poverty level of about 20%. (Dkt. No. 27-2, Impact Statement Nogales United School District, Bates No. 9.000256.) It serves approximately 5700 students. (*Id.*) The impact on the Nogales School District is estimated at $11,242,072.45 (before any restitution allocation). (*Id.*) This amount is one-third of the management and operations budget for the year. (*Id.*) For example, if this total loss were charged to the books in one year, this would equate to a loss of 160 to 170 full-time teaching positions. (*Id.*)

Additionally, as part of a needs assessment to decide upon a bond sale, the Nogales District was assessed to have millions of dollars in needs. There are needs for aging buildings, new HVAC units, emergency expenditures on water and gas lines for declining utility lines and pipes, failing fire alarm and intercom systems, and the need to repair aging athletic facilities. (Dkt. No. 27-2, Bates Nos. 9.000257-9.000258.)

Santa Cruz Elementary School District No. 28 (District 28) is a small rural school outside of Nogales, Arizona with approximately 127 students. (Exh. 5, Interview of Superintendent/Principal, and counsel for the district, Bates No. 9.000450.) District 28 estimates that their share of the loss is under $70,000.00. (*Id.*, Bates No. 9.000447.) Last year, the school district was classified as a high financial risk because of the low student enrollment. (*Id.*) Part of the problem was the cash from property tax. (*Id.*, Bates No. 9.000450.) However, the school pulled out of high financial risk category. (*Id.*, Bates No. 000450-451.)

The Superintendent of Santa Cruz District 28 stated that, "[e]very penny that comes in is crucial for what we do for our students." (Exh. 5, Bates No. 9.000451.) The school needs a new basketball court tarp to shade the children ($30,000 to 40,000 to repair), the gym floor is in dire need of repair, and there is no funding for afterschool programs after a grant was no longer available. (*Id.*, Bates No. 9.000454-455.)

The Sonoita District No. 25 has a potential loss of $516,000 (before any restitution allocation of an estimated amount of $162,000). (Exh. 6, Interview with Superintendent Sonoita District 25 and Business Manager, Bates No. 9.00138,141.) The Sonoita school

district Superintendent would like to replace a 25-year-old building which was meant as a temporary structure and put in a new science lab for the middle-school. (*Id.*, Bates No. 9.000149.) The $500,00.00 that defendant stole would almost pay for it. (*Id.*) However, there has been no official budget set for this. (*Id.*, Bates No. 9.000152.) For a school district with only a $2 million dollar budget, $500,000.00 could pay for such things as increasing teacher pay, recruiting teachers, implementing curriculum, and buying new desks. (*Id.*) The Superintendent stated that "[i]t's a big chunk of money for a really small district." (*Id.*)

The Patagonia Elementary and High School Districts would also be affected by a cash shortfall. If the thefts are charged against the Patagonia school districts' cash accounts over one year the amount could be as much a total of $1,344,686.60. (Exh. 7, Interview of Superintendent for Patagonia Elementary and High School Districts, and Business Manager for Patagonia Elementary, Bates No. 9.000110-111.) It would affect the district's ability to retain teachers by giving them appropriate raises. (*Id.*, Bates No. 9.000115.) The Superintendent stated that in order for the Patagonia school districts to recover, "[i]t'll take us a decade at least, probably." (*Id.*, Bates No. 9.000116.) The Patagonia school districts have been discussing eliminating the music or art programs to make payroll if cash is short. (Bates No. 9.000113-114.)

The Rio Rico Fire District allocation of the loss is approximately $1.6 million dollars. (Exh. 8, Interview of Fire Chief and Administrative Manager for Rio Rico Fire District, Bates. No. 9.000395.) After a potential reimbursement from the County of $320,000.00 the loss will be about $1.3 million. (*Id.*) The district has had to reevaluate the purchasing of equipment and morale has suffered. (Bates No. 9.000386.) There is uncertainty about whether the district will be able to buy the ambulances and trucks needed. (*Id.*, Bates No. 9.000394.)

       3. <u>The need to avoid unwanted sentencing disparities.</u>

There may be few cases comparable to defendant's theft of $38.7 million dollars while serving as a public servant in a rural community. In *United States. v. Crundwell*, the

defendant was the comptroller of a small city with a population of less than 16,000. *United States v. Crundwell*, 735 F.3d 743, 746 (7th Cir. 2013). Over twenty years, defendant stole $53,000,000.00 dollars of public funds to support a lavish lifestyle, including more than 400 quarter horses. *Id*. at 744. Defendant was convicted of wire fraud in violation of Title 18 U.S.C. § 1343. Defendant Crundwell was sentenced to 235 months imprisonment because she single-handedly stole from the citizens of a small community ten times as much as public officials in the Teapot Dome Affair, "the national government's most notorious financial scandal." *Id.* at 746.

The underlying facts in *Crundwell* are very similar. Defendant Crundwell opened an account at a local bank, naming it a "Reserve Fund" to make it look legitimate, and had sole control over disbursements. *Id.* at 744. Crundwell was also less than totally honest when she told prosecutors that the crime began a decade earlier than it actually did. *Id*. at 745.

### 4. Restitution

In the plea agreement, defendant agreed to pay restitution to Santa Cruz County in the amount of $38,712,100.00. (Dkt. No. 12, Plea Agreement, ¶ 20). The defendant agreed to not to contest the sales of assets subject to the Receivership in C20244535. (Dkt. No. 12. ¶. 20). As of March 31, 2025, the gross cash recovered through the Receivership is $6,728,882.00. (Dkt. No. 27-6, Fourth Receiver's Report). The estimated gross recovery value of future asset sales is between $10,738,610.00 and $13,528,610.00. Even so, defendant will never make the County resident's whole.

The defendant also agreed in the plea agreement to pay restitution to the United States Treasury in the amount of $13,143,526.00 for tax years 2014 through 2023. (Dkt, No. 12, ¶21.) Payment of restitution to the U.S. Treasury will follow payment in full of restitution owed to Santa Cruz County in the amount of $38,712,100.00 and the satisfaction of any judgment under C20244535.

The United States proposes that an order of restitution be deferred until 60 days following sentencing to reduce the amount of the restitution order by the gross recovery of

funds through the Receiver on or before that date. The parties will file a Proposed Restitution Order with the Court. It is proposed that following the order of restitution, any amounts collected by the Receiver shall be credited against the balance owed to Santa Cruz County. Under the proposed restitution order, the Clerk's Office would credit the restitution owed to Santa Cruz County upon: 1) a Notice of Receipt of Funds filed by the Santa Cruz County Board of Supervisors with a copy of the payment attached (wire transfer record, check, etc.), or 2) any direct payment of funds through the Clerk of the United States District Court, Tucson, Arizona.

Defense counsel and the attorneys for the Santa Cruz County Board of Supervisors were contacted about the above proposed restitution order to obtain their position.

## CONCLUSION

For all of the foregoing reasons, defendant's abuse of the public trust warrants a guideline sentence of 108 months imprisonment, three (3) years of supervised release, and restitution to the County in the amount of $38,712,100.00. This sentence will be a just punishment, promote respect for the law, and deter other public officials from such an egregious abuse of power.

Respectfully submitted this 16th of June 2025.

TIMOTHY COURCHAINE
United States Attorney
District of Arizona

EDWARD P. SULLIVAN
Acting Chief, Public Integrity Section
U.S. Department of Justice

/s/ Jane L. Westby
Jane L. Westby
Assistant U.S. Attorney

/s/ Nicholas W. Cannon
Nicholas W. Cannon
Senior Litigation Counsel

Copy served electronically
on June 16, 2025, to all ECF participants.